BOARD OF EDUCATION OF THE HENDRICK HUD-
SON CENTRAL SCHOOL DISTRICT, WESTCHESTER
COUNTY, ET AL. *v.* ROWLEY, BY HER
PARENTS, ROWLEY ET UX.

No. 80–1002.   Argued March 23, 1982—Decided June 28, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 210. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 212.

*Raymond G. Kuntz* argued the cause for petitioners. With him on the briefs were *Robert D. Stone, Jean M. Coon, Paul E. Sherman, Jr.*, and *Donald O. Meserve.*

*Michael A. Chatoff* argued the cause and filed a brief for respondents.

*Elliott Schulder* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Walter W. Barnett,* and *Louise A. Lerner.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Charles S. Sims* for the American Civil Liberties Union; by *Jane Bloom Yohalem, Norman S. Rosenberg, Daniel Yohalem,* and *Marian Wright Edelman* for the

JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents a question of statutory interpretation. Petitioners contend that the Court of Appeals and the District Court misconstrued the requirements imposed by Congress upon States which receive federal funds under the Education of the Handicapped Act. We agree and reverse the judgment of the Court of Appeals.

I

The Education of the Handicapped Act (Act), 84 Stat. 175, as amended, 20 U. S. C. § 1401 *et seq.* (1976 ed. and Supp. IV), provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures. The Act represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" H. R. Rep. No. 94–332, p. 2 (1975) (H. R. Rep.). The Act's evolution and major provisions shed light on the question of statutory interpretation which is at the heart of this case.

Congress first addressed the problem of educating the handicapped in 1966 when it amended the Elementary and

Association for Retarded Citizens of the United States et al.; by *Ralph J. Moore, Jr.,* and *Franklin D. Kramer* for the Maryland Advocacy Unit for the Developmentally Disabled, Inc., et al.; by *Marc Charmatz, Janet Stotland,* and *Joseph Blum* for the National Association of the Deaf et al; by *Minna J. Kotkin* and *Barry Felder* for the New York State Commission on the Quality of Care for the Mentally Disabled, Protection and Advocacy System; and by *Michael A. Rebell* for the United Cerebral Palsy Associations, Inc., et al.

*Norman H. Gross, Gwendolyn H. Gregory, Thomas A. Shannon,* and *August W. Steinhilber* filed a brief for the National School Boards Association et al. as *amici curiae.*

Secondary Education Act of 1965 to establish a grant program "for the purpose of assisting the States in the initiation, expansion, and improvement of programs and projects . . . for the education of handicapped children." Pub. L. 89–750, § 161, 80 Stat. 1204. That program was repealed in 1970 by the Education of the Handicapped Act, Pub. L. 91–230, 84 Stat. 175, Part B of which established a grant program similar in purpose to the repealed legislation. Neither the 1966 nor the 1970 legislation contained specific guidelines for state use of the grant money; both were aimed primarily at stimulating the States to develop educational resources and to train personnel for educating the handicapped.[1]

Dissatisfied with the progress being made under these earlier enactments, and spurred by two District Court decisions holding that handicapped children should be given access to a public education,[2] Congress in 1974 greatly increased federal funding for education of the handicapped and for the first time required recipient States to adopt "a goal of providing full educational opportunities to all handicapped children." Pub. L. 93–380, 88 Stat. 579, 583 (1974 statute). The 1974 statute was recognized as an interim measure only, adopted "in order to give the Congress an additional year in which to study what if any additional Federal assistance [was] required to enable the States to meet the needs of handicapped children." H. R. Rep., at 4. The ensuing year of study produced the Education for All Handicapped Children Act of 1975.

In order to qualify for federal financial assistance under the Act, a State must demonstrate that it "has in effect a policy

---

[1] See S. Rep. No. 94–168, p. 5 (1975) (S. Rep.); H. R. Rep., at 2–3.

[2] Two cases, *Mills* v. *Board of Education of District of Columbia,* 348 F. Supp. 866 (DC 1972), and *Pennsylvania Assn. for Retarded Children* v. *Commonwealth,* 334 F. Supp. 1257 (ED Pa. 1971) and 343 F. Supp. 279 (1972), were later identified as the most prominent of the cases contributing to Congress' enactment of the Act and the statutes which preceded it. H. R. Rep., at 3–4. Both decisions are discussed in Part III of this opinion.

that assures all handicapped children the right to a free appropriate public education." 20 U. S. C. § 1412(1). That policy must be reflected in a state plan submitted to and approved by the Secretary of Education,[3] § 1413, which describes in detail the goals, programs, and timetables under which the State intends to educate handicapped children within its borders. §§ 1412, 1413. States receiving money under the Act must provide education to the handicapped by priority, first "to handicapped children who are not receiving an education" and second "to handicapped children . . . with the most severe handicaps who are receiving an inadequate education," § 1412(3), and "to the maximum extent appropriate" must educate handicapped children "with children who are not handicapped." § 1412(5).[4] The Act broadly defines "handicapped children" to include "mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, [and] other health impaired children, [and] children with specific learning disabilities." § 1401(1).[5]

The "free appropriate public education" required by the Act is tailored to the unique needs of the handicapped child by means of an "individualized educational program" (IEP).

---

[3] All functions of the Commissioner of Education, formerly an officer in the Department of Health, Education, and Welfare, were transferred to the Secretary of Education in 1979 when Congress passed the Department of Education Organization Act, 20 U. S. C. § 3401 *et seq.* (1976 ed., Supp. IV). See 20 U. S. C. § 3441(a)(1) (1976 ed., Supp. IV).

[4] Despite this preference for "mainstreaming" handicapped children—educating them with nonhandicapped children—Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. The Act expressly acknowledges that "the nature or severity of the handicap [may be] such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(5). The Act thus provides for the education of some handicapped children in separate classes or institutional settings. See *ibid.;* § 1413(a)(4).

[5] In addition to covering a wide variety of handicapping conditions, the Act requires special educational services for children "regardless of the severity of their handicap." §§ 1412(2)(C), 1414(a)(1)(A).

§ 1401(18). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

"(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." § 1401(19).

Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. § 1414(a)(5). See also § 1413(a)(11).

In addition to the state plan and the IEP already described, the Act imposes extensive procedural requirements upon States receiving federal funds under its provisions. Parents or guardians of handicapped children must be notified of any proposed change in "the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child," and must be permitted to bring a complaint about "any matter relating to" such evaluation and education. §§ 1415(b)(1)(D) and (E).[6]

_____

[6] The requirements that parents be permitted to file complaints regarding their child's education, and be present when the child's IEP is formulated, represent only two examples of Congress' effort to maximize parental involvement in the education of each handicapped child. In addition, the Act requires that parents be permitted "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and . . . to obtain an independent educational evaluation of the child." § 1415(b)(1)(A). See also §§ 1412(4), 1414(a)(4). State educa-

Complaints brought by parents or guardians must be resolved at "an impartial due process hearing," and appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level.   §§ 1415(b)(2) and (c).[7]   Thereafter, "[a]ny party aggrieved by the findings and decision" of the state administrative hearing has "the right to bring a civil action with respect to the complaint . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."   § 1415(e)(2).

Thus, although the Act leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, it imposes significant requirements to be followed in the discharge of that responsibility.   Compliance is assured by provisions permitting the withholding of federal funds upon determination that a participating state or local agency has failed to satisfy the requirements of the Act, §§ 1414(b)(2)(A), 1416, and by the provision for judicial review.   At present, all States except New

---

tional policies and the state plan submitted to the Secretary of Education must be formulated in "consultation with individuals involved in or concerned with the education of handicapped children, including handicapped individuals and parents or guardians of handicapped children."   § 1412(7). See also § 1412(2)(E).   Local agencies, which receive funds under the Act by applying to the state agency, must submit applications which assure that they have developed procedures for "the participation and consultation of the parents or guardian[s] of [handicapped] children" in local educational programs, § 1414(a)(1)(C)(iii), and the application itself, along with "all pertinent documents related to such application," must be made "available to parents, guardians, and other members of the general public." § 1414(a)(4).

[7] "Any party" to a state or local administrative hearing must "be accorded (1) the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of handicapped children, (2) the right to present evidence and confront, cross examine, and compel the attendance of witnesses, (3) the right to a written or electronic verbatim record of such hearing, and (4) the right to written findings of fact and decisions."   § 1415(d).

Mexico receive federal funds under the portions of the Act at issue today. Brief for United States as *Amicus Curiae* 2, n. 2.

## II

This case arose in connection with the education of Amy Rowley, a deaf student at the Furnace Woods School in the Hendrick Hudson Central School District, Peekskill, N. Y. Amy has minimal residual hearing and is an excellent lip-reader. During the year before she began attending Furnace Woods, a meeting between her parents and school administrators resulted in a decision to place her in a regular kindergarten class in order to determine what supplemental services would be necessary to her education. Several members of the school administration prepared for Amy's arrival by attending a course in sign-language interpretation, and a teletype machine was installed in the principal's office to facilitate communication with her parents who are also deaf. At the end of the trial period it was determined that Amy should remain in the kindergarten class, but that she should be provided with an FM hearing aid which would amplify words spoken into a wireless receiver by the teacher or fellow students during certain classroom activities. Amy successfully completed her kindergarten year.

As required by the Act, an IEP was prepared for Amy during the fall of her first-grade year. The IEP provided that Amy should be educated in a regular classroom at Furnace Woods, should continue to use the FM hearing aid, and should receive instruction from a tutor for the deaf for one hour each day and from a speech therapist for three hours each week. The Rowleys agreed with parts of the IEP but insisted that Amy also be provided a qualified sign-language interpreter in all her academic classes in lieu of the assistance proposed in other parts of the IEP. Such an interpreter had been placed in Amy's kindergarten class for a 2-week experimental period, but the interpreter had reported that Amy did not need his services at that time. The school administra-

tors likewise concluded that Amy did not need such an interpreter in her first-grade classroom. They reached this conclusion after consulting the school district's Committee on the Handicapped, which had received expert evidence from Amy's parents on the importance of a sign-language interpreter, received testimony from Amy's teacher and other persons familiar with her academic and social progress, and visited a class for the deaf.

When their request for an interpreter was denied, the Rowleys demanded and received a hearing before an independent examiner. After receiving evidence from both sides, the examiner agreed with the administrators' determination that an interpreter was not necessary because "Amy was achieving educationally, academically, and socially" without such assistance. App. to Pet. for Cert. F–22. The examiner's decision was affirmed on appeal by the New York Commissioner of Education on the basis of substantial evidence in the record. *Id.*, at E–4. Pursuant to the Act's provision for judicial review, the Rowleys then brought an action in the United States District Court for the Southern District of New York, claiming that the administrators' denial of the sign-language interpreter constituted a denial of the "free appropriate public education" guaranteed by the Act.

The District Court found that Amy "is a remarkably well-adjusted child" who interacts and communicates well with her classmates and has "developed an extraordinary rapport" with her teachers. 483 F. Supp. 528, 531 (1980). It also found that "she performs better than the average child in her class and is advancing easily from grade to grade," *id.*, at 534, but "that she understands considerably less of what goes on in class than she could if she were not deaf" and thus "is not learning as much, or performing as well academically, as she would without her handicap," *id.*, at 532. This disparity between Amy's achievement and her potential led the court to decide that she was not receiving a "free appropriate pub-

lic education," which the court defined as "an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children." *Id.*, at 534. According to the District Court, such a standard "requires that the potential of the handicapped child be measured and compared to his or her performance, and that the resulting differential or 'shortfall' be compared to the shortfall experienced by nonhandicapped children." *Ibid.* The District Court's definition arose from its assumption that the responsibility for "giv[ing] content to the requirement of an 'appropriate education'" had "been left entirely to the [federal] courts and the hearing officers." *Id.*, at 533.[8]

A divided panel of the United States Court of Appeals for the Second Circuit affirmed. The Court of Appeals "agree[d] with the [D]istrict [C]ourt's conclusions of law," and held that its "findings of fact [were] not clearly erroneous." 632 F. 2d 945, 947 (1980).

We granted certiorari to review the lower courts' interpretation of the Act. 454 U. S. 961 (1981). Such review requires us to consider two questions: What is meant by the Act's requirement of a "free appropriate public education"? And what is the role of state and federal courts in exercising the review granted by 20 U. S. C. § 1415? We consider these questions separately.[9]

---

[8] For reasons that are not revealed in the record, the District Court concluded that "[t]he Act itself does not define 'appropriate education.'" 483 F. Supp., at 533. In fact, the Act expressly defines the phrase "free appropriate public education," see § 1401(18), to which the District Court was referring. See 483 F. Supp., at 533. After overlooking the statutory definition, the District Court sought guidance not from regulations interpreting the Act, but from regulations promulgated under § 504 of the Rehabilitation Act. See 483 F. Supp., at 533, citing 45 CFR § 84.33(b).

[9] The IEP which respondents challenged in the District Court was created for the 1978–1979 school year. Petitioners contend that the District Court erred in reviewing that IEP after the school year had ended and before the school administrators were able to develop another IEP for subsequent years. We disagree. Judicial review invariably takes more than

III

A

This is the first case in which this Court has been called upon to interpret any provision of the Act. As noted previously, the District Court and the Court of Appeals concluded that "[t]he Act itself does not define 'appropriate education,'" 483 F. Supp., at 533, but leaves "to the courts and the hearing officers" the responsibility of "giv[ing] content to the requirement of an 'appropriate education.'" *Ibid.* See also 632 F. 2d, at 947. Petitioners contend that the definition of the phrase "free appropriate public education" used by the courts below overlooks the definition of that phrase actually found in the Act. Respondents agree that the Act defines "free appropriate public education," but contend that the statutory definition is not "functional" and thus "offers judges no guidance in their consideration of controversies involving 'the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education.'" Brief for Respondents 28. The United States, appearing as *amicus curiae* on behalf of respondents, states that "[a]lthough the Act includes definitions of a 'free appropriate public education' and other related terms, the statutory definitions do not adequately explain what is meant by 'appropriate.'" Brief for United States as *Amicus Curiae* 13.

We are loath to conclude that Congress failed to offer any assistance in defining the meaning of the principal substantive phrase used in the Act. It is beyond dispute that, contrary to the conclusions of the courts below, the Act does expressly define "free appropriate public education":

nine months to complete, not to mention the time consumed during the preceding state administrative hearings. The District Court thus correctly ruled that it retained jurisdiction to grant relief because the alleged deficiencies in the IEP were capable of repetition as to the parties before it yet evading review. 483 F. Supp. 536, 538 (1980). See *Murphy* v. *Hunt*, 455 U. S. 478, 482 (1982); *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975).

"The term 'free appropriate public education' means *special education* and *related services* which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." § 1401(18) (emphasis added).

"Special education," as referred to in this definition, means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." § 1401(16). "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a handicapped child to benefit from special education." § 1401(17).[10]

Like many statutory definitions, this one tends toward the cryptic rather than the comprehensive, but that is scarcely a reason for abandoning the quest for legislative intent. Whether or not the definition is a "functional" one, as respondents contend it is not, it is the principal tool which Congress has given us for parsing the critical phrase of the Act. We think more must be made of it than either respondents or the United States seems willing to admit.

According to the definitions contained in the Act, a "free appropriate public education" consists of educational instruction specially designed to meet the unique needs of the handi-

---

[10] Examples of "related services" identified in the Act are "speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only." § 1401(17).

capped child, supported by such services as are necessary to permit the child "to benefit" from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act.

Other portions of the statute also shed light upon congressional intent. Congress found that of the roughly eight million handicapped children in the United States at the time of enactment, one million were "excluded entirely from the public school system" and more than half were receiving an inappropriate education. 89 Stat. 774, note following § 1401. In addition, as mentioned in Part I, the Act requires States to extend educational services first to those children who are receiving no education and second to those children who are receiving an "inadequate education." § 1412(3). When these express statutory findings and priorities are read together with the Act's extensive procedural requirements and its definition of "free appropriate public education," the face of the statute evinces a congressional intent to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt *procedures* which would result in individualized consideration of and instruction for each child.

Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children. Certainly the language of the statute contains no requirement like the one imposed by the lower courts—that States maximize the potential of handicapped children "commensurate with the opportunity

provided to other children." 483 F. Supp., at 534. That standard was expounded by the District Court without reference to the statutory definitions or even to the legislative history of the Act. Although we find the statutory definition of "free appropriate public education" to be helpful in our interpretation of the Act, there remains the question of whether the legislative history indicates a congressional intent that such education meet some additional substantive standard. For an answer, we turn to that history.[11]

---

[11] The dissent, finding that "the standard of the courts below seems . . . to reflect the congressional purpose" of the Act, *post,* at 218, concludes that our answer to this question "is not a satisfactory one." *Post,* at 216. Presumably, the dissent also agrees with the District Court's conclusion that "it has been left entirely to the courts and the hearing officers to give content to the requirement of an 'appropriate education.'" 483 F. Supp., at 533. It thus seems that the dissent would give the courts *carte blanche* to impose upon the States whatever burden their various judgments indicate should be imposed. Indeed, the dissent clearly characterizes the requirement of an "appropriate education" as open-ended, noting that "if there are limits not evident from the face of the statute on what may be considered an 'appropriate education,' they must be found in the purpose of the statute or its legislative history." *Post,* at 213. Not only are we unable to find any suggestion from the face of the statute that the requirement of an "appropriate education" was to be limitless, but we also view the dissent's approach as contrary to the fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously. See *infra,* at 204, n. 26.

No one can doubt that this would have been an easier case if Congress had seen fit to provide a more comprehensive statutory definition of the phrase "free appropriate public education." But Congress did not do so, and "our problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort." *62 Cases of Jam* v. *United States,* 340 U. S. 593, 596 (1951). We would be less than faithful to our obligation to construe what Congress has written if in this case we were to disregard the statutory language and legislative history of the Act by concluding that Congress had imposed upon the States a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication in the courts.

B

(i)

As suggested in Part I, federal support for education of the handicapped is a fairly recent development.   Before passage of the Act some States had passed laws to improve the educational services afforded handicapped children,[12] but many of these children were excluded completely from any form of public education or were left to fend for themselves in classrooms designed for education of their nonhandicapped peers. As previously noted, the House Report begins by emphasizing this exclusion and misplacement, noting that millions of handicapped children "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"   H. R. Rep., at 2. See also S. Rep., at 8.   One of the Act's two principal sponsors in the Senate urged its passage in similar terms:

> "While much progress has been made in the last few years, we can take no solace in that progress until all handicapped children are, in fact, receiving an education. The most recent statistics provided by the Bureau of Education for the Handicapped estimate that . . . 1.75 million handicapped children do not receive any educational services, and 2.5 million handicapped children are not receiving an appropriate education."   121 Cong. Rec. 19486 (1975) (remarks of Sen. Williams).

This concern, stressed repeatedly throughout the legislative history,[13] confirms the impression conveyed by the lan-

---

[12] See H. R. Rep., at 10; Note, The Education of All Handicapped Children Act of 1975, 10 U. Mich. J. L. Ref. 110, 119 (1976).

[13] See, e. g., 121 Cong. Rec. 19494 (1975) (remarks of Sen. Javits) ("all too often, our handicapped citizens have been denied the opportunity to receive an adequate education"); id., at 19502 (remarks of Sen. Cranston) (millions of handicapped "children . . . are largely excluded from the educational opportunities that we give to our other children"); id., at 23708 (remarks of Rep. Mink) ("handicapped children . . . are denied access to public schools because of a lack of trained personnel").

guage of the statute: By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful. Indeed, Congress expressly "recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." S. Rep., at 11. Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

Both the House and the Senate Reports attribute the impetus for the Act and its predecessors to two federal-court judgments rendered in 1971 and 1972. As the Senate Report states, passage of the Act "followed a series of landmark court cases establishing in law the right to education for all handicapped children." S. Rep., at 6.[14] The first case, *Pennsylvania Assn. for Retarded Children* v. *Commonwealth,* 334 F. Supp. 1257 (ED Pa. 1971) and 343 F. Supp. 279 (1972) *(PARC),* was a suit on behalf of retarded children challenging the constitutionality of a Pennsylvania statute which acted to exclude them from public education and training. The case ended in a consent decree which enjoined the State from "deny[ing] to any mentally retarded child *access* to a free public program of education and training." 334 F. Supp., at 1258 (emphasis added).

*PARC* was followed by *Mills* v. *Board of Education of District of Columbia,* 348 F. Supp. 866 (DC 1972), a case in which the plaintiff handicapped children had been excluded

---

[14] Similarly, the Senate Report states that it was an "[i]ncreased awareness of the educational needs of handicapped children and landmark court decisions establishing the right to education for handicapped children [that] pointed to the necessity of an expanded federal fiscal role." S. Rep., at 5. See also H. R. Rep., at 2–3.

from the District of Columbia public schools. The court's judgment, quoted in S. Rep., at 6, provided that

> "no [handicapped] child eligible for a publicly supported education in the District of Columbia public schools shall be *excluded* from a regular school assignment by a Rule, policy, or practice of the Board of Education of the District of Columbia or its agents unless such child is provided (a) *adequate* alternative educational services suited to the child's needs, which may include special education or tuition grants, and (b) a constitutionally adequate prior hearing and periodic review of the child's status, progress, and the *adequacy* of any educational alternative." 348 F. Supp., at 878 (emphasis added).

*Mills* and *PARC* both held that handicapped children must be given *access* to an adequate, publicly supported education. Neither case purports to require any particular substantive level of education.[15] Rather, like the language of the Act,

---

[15] The only substantive standard which can be implied from these cases comports with the standard implicit in the Act. *PARC* states that each child must receive "access to a free public program of education and training *appropriate to his learning capacities*," 334 F. Supp., at 1258 (emphasis added), and that further state action is required when it appears that "the needs of the mentally retarded child are not being *adequately* served," *id.*, at 1266. (Emphasis added.) *Mills* also speaks in terms of "adequate" educational services, 348 F. Supp., at 878, and sets a realistic standard of providing *some* educational services to each child when every need cannot be met.

"If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom. The inadequacies of the District of Columbia Public School System whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the 'exceptional' or handicapped child than on the normal child." *Id.*, at 876.

the cases set forth extensive procedures to be followed in formulating personalized educational programs for handicapped children. See 348 F. Supp., at 878–883; 334 F. Supp., at 1258–1267.[16] The fact that both *PARC* and *Mills* are discussed at length in the legislative Reports [17] suggests that the principles which they established are the principles which, to a significant extent, guided the drafters of the Act. Indeed, immediately after discussing these cases the Senate Report describes the 1974 statute as having "incorporated the major principles of the right to education cases." S. Rep., at 8. Those principles in turn became the basis of the Act, which itself was designed to effectuate the purposes of the 1974 statute. H. R. Rep., at 5.[18]

---

[16] Like the Act, *PARC* required the State to "identify, locate, [and] evaluate" handicapped children, 334 F. Supp., at 1267, to create for each child an individual educational program, *id.*, at 1265, and to hold a hearing "on any change in educational assignment," *id.*, at 1266. *Mills* also required the preparation of an individual educational program for each child. In addition, *Mills* permitted the child's parents to inspect records relevant to the child's education, to obtain an independent educational evaluation of the child, to object to the IEP and receive a hearing before an independent hearing officer, to be represented by counsel at the hearing, and to have the right to confront and cross-examine adverse witnesses, all of which are also permitted by the Act. 348 F. Supp., at 879–881. Like the Act, *Mills* also required that the education of handicapped children be conducted pursuant to an overall plan prepared by the District of Columbia, and established a policy of educating handicapped children with nonhandicapped children whenever possible. *Ibid.*

[17] See S. Rep., at 6–7; H. R. Rep., at 3–4.

[18] The 1974 statute "incorporated the major principles of the right to education cases," by "add[ing] important new provisions to the Education of the Handicapped Act which require the States to: establish a goal of providing full educational opportunities to all handicapped children; provide procedures for insuring that handicapped children and their parents or guardians are guaranteed procedural safeguards in decisions regarding identification, evaluation, and educational placement of handicapped children; establish procedures to insure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped; . . . and, establish procedures to insure that testing and evaluation materials and procedures utilized for the purposes of classification

That the Act imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education is perhaps best demonstrated by the fact that Congress, in explaining the need for the Act, equated an "appropriate education" to the receipt of some specialized educational services. The Senate Report states: "[T]he most recent statistics provided by the Bureau of Education for the Handicapped estimate that of the more than 8 million children . . . with handicapping conditions requiring special education and related services, only 3.9 million such children are receiving an appropriate education." S. Rep., at 8.[19] This statement, which reveals Congress' view that 3.9 million handicapped children were "receiving an appropriate education" in 1975, is followed immediately in the Senate Report by a table showing that 3.9 million handicapped children were "served" in 1975 and a slightly larger number were "unserved." A similar statement and table appear in the House Report. H. R. Rep., at 11–12.

---

and placement of handicapped children will be selected and administered so as not to be racially or culturally discriminatory." S. Rep., at 8.

The House Report explains that the Act simply incorporated these purposes of the 1974 statute: the Act was intended "primarily to amend . . . the Education of the Handicapped Act in order to provide permanent authorization and a comprehensive mechanism which will insure that those provisions enacted during the 93rd Congress [the 1974 statute] will result in maximum benefits for handicapped children and their families." H. R. Rep., at 5. Thus, the 1974 statute's purpose of providing handicapped children *access* to a public education became the purpose of the Act.

[19] These statistics appear repeatedly throughout the legislative history of the Act, demonstrating a virtual consensus among legislators that 3.9 million handicapped children were receiving an appropriate education in 1975. See, *e. g.*, 121 Cong. Rec. 19486 (1975) (remarks of Sen. Williams); *id.*, at 19504 (remarks of Sen. Schweicker); *id.*, at 23702 (remarks of Rep. Madden); *ibid.* (remarks of Rep. Brademas); *id.*, at 23709 (remarks of Rep. Minish); *id.*, at 37024 (remarks of Rep. Brademas); *id.*, at 37027 (remarks of Rep. Gude); *id.*, at 37417 (remarks of Sen. Javits); *id.*, at 37420 (remarks of Sen. Hathaway).

It is evident from the legislative history that the characterization of handicapped children as "served" referred to children who were receiving some form of specialized educational services from the States, and that the characterization of children as "unserved" referred to those who were receiving no specialized educational services.  For example, a letter sent to the United States Commissioner of Education by the House Committee on Education and Labor, signed by two key sponsors of the Act in the House, asked the Commissioner to identify the number of handicapped "children served" in each State.  The letter asked for statistics on the number of children "being served" in various types of "special education program[s]" and the number of children who were not "receiving educational services."  Hearings on S. 6 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare, 94th Cong., 1st Sess., 205–207 (1975).  Similarly, Senator Randolph, one of the Act's principal sponsors in the Senate, noted that roughly one-half of the handicapped children in the United States "are receiving special educational services."  *Id.*, at 1.[20]  By

---

[20] Senator Randolph stated: "[O]nly 55 percent of the school-aged handicapped children and 22 percent of the pre-school-aged handicapped children are receiving special educational services."  Hearings on S. 6 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare, 94th Cong., 1st Sess., 1 (1975).  Although the figures differ slightly in various parts of the legislative history, the general thrust of congressional calculations was that roughly one-half of the handicapped children in the United States were not receiving specialized educational services, and thus were not "served."  See, *e. g.*, 121 Cong. Rec. 19494 (1975) (remarks of Sen. Javits) ("only 50 percent of the Nation's handicapped children received proper education services"); *id.*, at 19504 (remarks of Sen. Humphrey) ("[a]lmost 3 million handicapped children, while in school, receive none of the special services that they require in order to make education a meaningful experience"); *id.*, at 23706 (remarks of Rep. Quie) ("only 55 percent [of handicapped children] were receiving a public education"); *id.*, at 23709 (remarks of Rep. Biaggi) ("[o]ver 3 million [handi-

characterizing the 3.9 million handicapped children who were "served" as children who were "receiving an appropriate education," the Senate and House Reports unmistakably disclose Congress' perception of the type of education required by the Act: an "appropriate education" is provided when personalized educational services are provided.[21]

capped] children in this country are receiving either below par education or none at all").

Statements similar to those appearing in the text, which equate "served" as it appears in the Senate Report to "receiving special educational services," appear throughout the legislative history. See, e. g., id., at 19492 (remarks of Sen. Williams); id., at 19494 (remarks of Sen. Javits); id., at 19496 (remarks of Sen. Stone); id., at 19504–19505 (remarks of Sen. Humphrey); id., at 23703 (remarks of Rep. Brademas); Hearings on H. R. 7217 before the Subcommittee on Select Education of the House Committee on Education and Labor, 94th Cong., 1st Sess., 91, 150, 153 (1975); Hearings on H. R. 4199 before the Select Subcommittee on Education of the House Committee on Education and Labor, 93d Cong., 1st Sess., 130, 139 (1973). See also 34 CFR § 300.343 (1981).

[21] In seeking to read more into the Act than its language or legislative history will permit, the United States focuses upon the word "appropriate," arguing that "the statutory definitions do not adequately explain what [it means]." Brief for United States as Amicus Curiae 13. Whatever Congress meant by an "appropriate" education, it is clear that it did not mean a potential-maximizing education.

The term as used in reference to educating the handicapped appears to have originated in the PARC decision, where the District Court required that handicapped children be provided with "education and training appropriate to [their] learning capacities." 334 F. Supp., at 1258. The word appears again in the Mills decision, the District Court at one point referring to the need for "an appropriate educational program," 348 F. Supp., at 879, and at another point speaking of a "suitable publicly-supported education," id., at 878. Both cases also refer to the need for an "adequate" education. See 334 F. Supp., at 1266; 348 F. Supp., at 878.

The use of "appropriate" in the language of the Act, although by no means definitive, suggests that Congress used the word as much to describe the settings in which handicapped children should be educated as to prescribe the substantive content or supportive services of their education. For example, § 1412(5) requires that handicapped children be educated in classrooms with nonhandicapped children "to the maximum extent appro-

(ii)

Respondents contend that "the goal of the Act is to provide each handicapped child with an equal educational opportunity." Brief for Respondents 35. We think, however, that the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential "commensurate with the opportunity provided other children." Respondents and the United States correctly note that Congress sought "to provide assistance to the States in carrying out their responsibilities under . . . the Constitution of the United States to provide equal protection of the laws." S. Rep., at 13.[22] But we do not think that such statements imply a congressional intent to achieve strict equality of opportunity or services.

The educational opportunities provided by our public school systems undoubtedly differ from student to student, depending upon a myriad of factors that might affect a particular student's ability to assimilate information presented in the classroom. The requirement that States provide "equal" educational opportunities would thus seem to present an entirely unworkable standard requiring impossible measurements and comparisons. Similarly, furnishing handicapped children with only such services as are available to nonhandi-

---

priate." Similarly, § 1401(19) provides that, "whenever appropriate," handicapped children should attend and participate in the meeting at which their IEP is drafted. In addition, the definition of "free appropriate public education" itself states that instruction given handicapped children should be at an "appropriate preschool, elementary, or secondary school" level. § 1401(18)(C). The Act's use of the word "appropriate" thus seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children. At the very least, these statutory uses of the word refute the contention that Congress used "appropriate" as a term of art which concisely expresses the standard found by the lower courts.

[22] See also 121 Cong. Rec. 19492 (1975) (remarks of Sen. Williams); id., at 19504 (remarks of Sen. Humphrey).

capped children would in all probability fall short of the statutory requirement of "free appropriate public education"; to require, on the other hand, the furnishing of every special service necessary to maximize each handicapped child's potential is, we think, further than Congress intended to go. Thus to speak in terms of "equal" services in one instance gives less than what is required by the Act and in another instance more. The theme of the Act is "free appropriate public education," a phrase which is too complex to be captured by the word "equal" whether one is speaking of opportunities or services.

The legislative conception of the requirements of equal protection was undoubtedly informed by the two District Court decisions referred to above. But cases such as *Mills* and *PARC* held simply that handicapped children may not be excluded entirely from public education. In *Mills*, the District Court said:

> "If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded from a publicly supported education consistent with his needs and ability to benefit therefrom." 348 F. Supp., at 876.

The *PARC* court used similar language, saying "[i]t is the commonwealth's obligation to place each mentally retarded child in a free, public program of education and training appropriate to the child's capacity . . . ." 334 F. Supp., at 1260. The right of access to free public education enunciated by these cases is significantly different from any notion of absolute equality of opportunity regardless of capacity. To the extent that Congress might have looked further than these cases which are mentioned in the legislative history, at the time of enactment of the Act this Court had held at least twice that the Equal Protection Clause of the Fourteenth

Amendment does not require States to expend equal finan-
cial resources on the education of each child. *San Antonio
Independent School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973);
*McInnis* v. *Shapiro,* 293 F. Supp. 327 (ND Ill. 1968), aff'd
*sub nom. McInnis* v. *Ogilvie,* 394 U. S. 322 (1969).

In explaining the need for federal legislation, the House
Report noted that "no congressional legislation has required
a precise guarantee for handicapped children, i. e. a basic
floor of opportunity that would bring into compliance all
school districts with the constitutional right of equal protec-
tion with respect to handicapped children." H. R. Rep., at
14. Assuming that the Act was designed to fill the need
identified in the House Report—that is, to provide a "basic
floor of opportunity" consistent with equal protection—nei-
ther the Act nor its history persuasively demonstrates that
Congress thought that equal protection required anything
more than equal access. Therefore, Congress' desire to pro-
vide specialized educational services, even in furtherance of
"equality," cannot be read as imposing any particular sub-
stantive educational standard upon the States.

The District Court and the Court of Appeals thus erred
when they held that the Act requires New York to maximize
the potential of each handicapped child commensurate with
the opportunity provided nonhandicapped children. Desir-
able though that goal might be, it is not the standard that
Congress imposed upon States which receive funding under
the Act. Rather, Congress sought primarily to identify and
evaluate handicapped children, and to provide them with ac-
cess to a free public education.

(iii)

Implicit in the congressional purpose of providing access to
a "free appropriate public education" is the requirement that
the education to which access is provided be sufficient to con-
fer some educational benefit upon the handicapped child. It
would do little good for Congress to spend millions of dollars
in providing access to a public education only to have the

handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specially designed instruction," expressly requires the provision of "such . . . supportive services . . . as may be required to assist a handicapped child *to benefit* from special education." § 1401(17) (emphasis added). We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.[23]

---

[23] This view is supported by the congressional intention, frequently expressed in the legislative history, that handicapped children be enabled to achieve a reasonable degree of self-sufficiency. After referring to statistics showing that many handicapped children were excluded from public education, the Senate Report states:

"The long range implications of these statistics are that public agencies and taxpayers will spend billions of dollars over the lifetimes of these individuals to maintain such persons as dependents and in a minimally acceptable lifestyle. With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society." S. Rep., at 9. See also H. R. Rep., at 11. Similarly, one of the principal Senate sponsors of the Act stated that "providing appropriate educational services now means that many of these individuals will be able to become a contributing part of our society, and they will not have to depend on subsistence payments from public funds." 121 Cong. Rec. 19492 (1975) (remarks of Sen. Williams). See also *id.*, at 25541 (remarks of Rep. Harkin); *id.*, at 37024–37025 (remarks of Rep. Brademas); *id.*, at 37027 (remarks of Rep. Gude); *id.*, at 37410 (remarks of Sen. Randolph); *id.*, at 37416 (remarks of Sen. Williams).

The desire to provide handicapped children with an attainable degree of personal independence obviously anticipated that state educational programs would confer educational benefits upon such children. But at the same time, the goal of achieving some degree of self-sufficiency in most cases is a good deal more modest than the potential-maximizing goal adopted by the lower courts.

Despite its frequent mention, we cannot conclude, as did the dissent in the Court of Appeals, that self-sufficiency was itself the substantive stand-

The determination of when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the Act presents a more difficult problem. The Act requires participating States to educate a wide spectrum of handicapped children, from the marginally hearing-impaired to the profoundly retarded and palsied. It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between. One child may have little difficulty competing successfully in an academic setting with nonhandicapped children while another child may encounter great difficulty in acquiring even the most basic of self-maintenance skills. We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act. Because in this case we are presented with a handicapped child who is receiving substantial specialized instruction and related services, and who is performing above average in the regular classrooms of a public school system, we confine our analysis to that situation.

The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible.[24] When that "mainstreaming" preference of the Act

___

ard which Congress imposed upon the States. Because many mildly handicapped children will achieve self-sufficiency without state assistance while personal independence for the severely handicapped may be an unreachable goal, "self-sufficiency" as a substantive standard is at once an inadequate protection and an overly demanding requirement. We thus view these references in the legislative history as evidence of Congress' intention that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap.

[24] Title 20 U. S. C. § 1412(5) requires that participating States establish "procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the

has been met and a child is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child. Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material. The grading and advancement system thus constitutes an important factor in determining educational benefit. Children who graduate from our public school systems are considered by our society to have been "educated" at least to the grade level they have completed, and access to an "education" for handicapped children is precisely what Congress sought to provide in the Act.[25]

## C

When the language of the Act and its legislative history are considered together, the requirements imposed by Congress become tolerably clear. Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of

---

nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

[25] We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a "free appropriate public education." In this case, however, we find Amy's academic progress, when considered with the special services and professional consideration accorded by the Furnace Woods school administrators, to be dispositive.

the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.[26]

## IV

## A

As mentioned in Part I, the Act permits "[a]ny party aggrieved by the findings and decision" of the state administrative hearings "to bring a civil action" in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." § 1415(e)(2). The complaint, and therefore the civil action, may concern "any matter relating to the identification, evaluation, or educational placement of the child, or the provi-

---

[26] In defending the decisions of the District Court and the Court of Appeals, respondents and the United States rely upon isolated statements in the legislative history concerning the achievement of maximum potential, see H. R. Rep., at 13, as support for their contention that Congress intended to impose greater substantive requirements than we have found. These statements, however, are too thin a reed on which to base an interpretation of the Act which disregards both its language and the balance of its legislative history. "Passing references and isolated phrases are not controlling when analyzing a legislative history." *Department of State* v. *Washington Post Co.*, 456 U. S. 595, 600 (1982).

Moreover, even were we to agree that these statements evince a congressional intent to maximize each child's potential, we could not hold that Congress had successfully imposed that burden upon the States.

"[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' . . . Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State School* v. *Halderman*, 451 U. S. 1, 17 (1981) (footnote omitted).

As already demonstrated, the Act and its history impose no requirements on the States like those imposed by the District Court and the Court of Appeals. *A fortiori* Congress has not done so unambiguously, as required in the valid exercise of its spending power.

sion of a free appropriate public education to such child."
§ 1415(b)(1)(E). In reviewing the complaint, the Act pro-
vides that a court "shall receive the record of the [state]
administrative proceedings, shall hear additional evidence at
the request of a party, and, basing its decision on the prepon-
derance of the evidence, shall grant such relief as the court
determines is appropriate." § 1415(e)(2).

The parties disagree sharply over the meaning of these
provisions, petitioners contending that courts are given only
limited authority to review for state compliance with the
Act's procedural requirements and no power to review the
substance of the state program, and respondents contending
that the Act requires courts to exercise *de novo* review over
state educational decisions and policies. We find petitioners'
contention unpersuasive, for Congress expressly rejected
provisions that would have so severely restricted the role of
reviewing courts. In substituting the current language of
the statute for language that would have made state adminis-
trative findings conclusive if supported by substantial evi-
dence, the Conference Committee explained that courts were
to make "independent decision[s] based on a preponderance
of the evidence." S. Conf. Rep. No. 94–455, p. 50 (1975).
See also 121 Cong. Rec. 37416 (1975) (remarks of Sen.
Williams).

But although we find that this grant of authority is broader
than claimed by petitioners, we think the fact that it is found
in § 1415, which is entitled "Procedural safeguards," is not
without significance. When the elaborate and highly specific
procedural safeguards embodied in § 1415 are contrasted with
the general and somewhat imprecise substantive admonitions
contained in the Act, we think that the importance Congress
attached to these procedural safeguards cannot be gainsaid.
It seems to us no exaggeration to say that Congress placed
every bit as much emphasis upon compliance with procedures
giving parents and guardians a large measure of participation
at every stage of the administrative process, see, *e. g.*,
§§ 1415(a)–(d), as it did upon the measurement of the result-

ing IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

Thus the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act?[27] And second, is the

---

[27] This inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act,

individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?[28] If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

## B

In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States.[29] The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child. The Act expressly charges States with the responsibility of "acquiring and disseminating to teachers and administrators of programs for handicapped children significant information derived from educational research, demonstration, and similar projects, and [of] adopting, where appropriate, promising educational practices and materials." § 1413(a)(3). In the face of such a clear statutory directive, it seems highly unlikely that Congress in-

---

but also to determine that the State has created an IEP for the child in question which conforms with the requirements of § 1401(19).

[28] When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit. See Part III, *supra.*

[29] In this case, for example, both the state hearing officer and the District Court were presented with evidence as to the best method for educating the deaf, a question long debated among scholars. See Large, Special Problems of the Deaf Under the Education for All Handicapped Children Act of 1975, 58 Wash. U. L. Q. 213, 229 (1980). The District Court accepted the testimony of respondents' experts that there was "a trend supported by studies showing the greater degree of success of students brought up in deaf households using [the method of communication used by the Rowleys]." 483 F. Supp., at 535.

tended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2).[30]

We previously have cautioned that courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy." *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S., at 42. We think that Congress shared that view when it passed the Act. As already demonstrated, Congress' intention was not that the Act displace the primacy of States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped. Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.

## V

Entrusting a child's education to state and local agencies does not leave the child without protection. Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies, *supra*, at 182–183, and n. 6, and in the formulation of the child's individual educational program. As the Senate Report states:

> "The Committee recognizes that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome. By changing the language [of the provision relating to individualized educational programs] to emphasize the process of parent and child

---

[30] It is clear that Congress was aware of the States' traditional role in the formulation and execution of educational policy. "Historically, the States have had the primary responsibility for the education of children at the elementary and secondary level." 121 Cong. Rec. 19498 (1975) (remarks of Sen. Dole). See also *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities").

involvement and to provide a written record of reason-
able expectations, the Committee intends to clarify that
such individualized planning conferences are a way to
provide parent involvement and protection to assure
that appropriate services are provided to a handicapped
child." S. Rep., at 11–12.

See also S. Conf. Rep. No. 94–445, p. 30 (1975); 34 CFR
§ 300.345 (1981). As this very case demonstrates, parents
and guardians will not lack ardor in seeking to ensure that
handicapped children receive all of the benefits to which they
are entitled by the Act.[31]

VI

Applying these principles to the facts of this case, we con-
clude that the Court of Appeals erred in affirming the deci-
sion of the District Court. Neither the District Court nor
the Court of Appeals found that petitioners had failed to com-
ply with the procedures of the Act, and the findings of nei-
ther court would support a conclusion that Amy's educational
program failed to comply with the substantive requirements
of the Act. On the contrary, the District Court found that
the "evidence firmly establishes that Amy is receiving an

---

[31] In addition to providing for extensive parental involvement in the for-
mulation of state and local policies, as well as the preparation of individual
educational programs, the Act ensures that States will receive the advice
of experts in the field of educating handicapped children. As a condition
for receiving federal funds under the Act, States must create "an advisory
panel, appointed by the Governor or any other official authorized under
State law to make such appointments, composed of individuals involved in
or concerned with the education of handicapped children, including handi-
capped individuals, teachers, parents or guardians of handicapped chil-
dren, State and local education officials, and administrators of programs
for handicapped children, which (A) advises the State educational agency
of unmet needs within the State in the education of handicapped children,
[and] (B) comments publicly on any rules or regulations proposed for is-
suance by the State regarding the education of handicapped children."
§ 1413(a)(12).

'adequate' education, since she performs better than the average child in her class and is advancing easily from grade to grade." 483 F. Supp., at 534. In light of this finding, and of the fact that Amy was receiving personalized instruction and related services calculated by the Furnace Woods school administrators to meet her educational needs, the lower courts should not have concluded that the Act requires the provision of a sign-language interpreter. Accordingly, the decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[32]

*So ordered.*

JUSTICE BLACKMUN, concurring in the judgment.

Although I reach the same result as the Court does today, I read the legislative history and goals of the Education of the Handicapped Act differently. Congress unambiguously stated that it intended to "take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided *equal educational opportunity.*" S. Rep. No. 94–168, p. 9 (1975) (emphasis added). See also 20 U. S. C. § 1412(2)(A)(i) (requiring States to establish plans with the "goal of providing full educational opportunity to all handicapped children").

As I have observed before, "[i]t seems plain to me that Congress, in enacting [this statute], intended to do more than merely set out politically self-serving but essentially meaningless language about what the [handicapped] deserve at the hands of state . . . authorities." *Pennhurst State School* v. *Halderman,* 451 U. S. 1, 32 (1981) (opinion concurring in part and concurring in judgment). The clarity of the legislative

---

[32] Because the District Court declined to reach respondents' contention that petitioners had failed to comply with the Act's procedural requirements in developing Amy's IEP, 483 F. Supp., at 533, n. 8, the case must be remanded for further proceedings consistent with this opinion.

intent convinces me that the relevant question here is not, as the Court says, whether Amy Rowley's individualized education program was "reasonably calculated to enable [her] to receive educational benefits," *ante*, at 207, measured in part by whether or not she "achieve[s] passing marks and advance[s] from grade to grade," *ante*, at 204. Rather, the question is whether Amy's program, *viewed as a whole*, offered her an opportunity to understand and participate in the classroom that was substantially equal to that given her non-handicapped classmates. This is a standard predicated on equal educational opportunity and equal access to the educational process, rather than upon Amy's achievement of any particular educational outcome.

In answering this question, I believe that the District Court and the Court of Appeals should have given greater deference than they did to the findings of the School District's impartial hearing officer and the State's Commissioner of Education, both of whom sustained petitioners' refusal to add a sign-language interpreter to Amy's individualized education program. Cf. 20 U. S. C. § 1415(e)(2) (requiring reviewing court to "receive the records of the administrative proceedings" before granting relief). I would suggest further that those courts focused too narrowly on the presence or absence of a particular service—a sign-language interpreter—rather than on the total package of services furnished to Amy by the School Board.

As the Court demonstrates, *ante*, at 184–185, petitioner Board has provided Amy Rowley considerably more than "a teacher with a loud voice." See *post*, at 215 (dissenting opinion). By concentrating on whether Amy was "learning as much, or performing as well academically, as she would without her handicap," 483 F. Supp. 528, 532 (SDNY 1980), the District Court and the Court of Appeals paid too little attention to whether, on the entire record, respondent's individualized education program offered her an educational op-

portunity substantially equal to that provided her nonhandi-
capped classmates. Because I believe that standard has
been satisfied here, I agree that the judgment of the Court of
Appeals should be reversed.

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUS-
TICE MARSHALL join, dissenting.

In order to reach its result in this case, the majority opin-
ion contradicts itself, the language of the statute, and the
legislative history. Both the majority's standard for a "free
appropriate education" and its standard for judicial review
disregard congressional intent.

I

The majority first turns its attention to the meaning of a
"free appropriate public education." The Act provides:

> "The term 'free appropriate public education' means
> special education and related services which (A) have
> been provided at public expense, under public super-
> vision and direction, and without charge, (B) meet
> the standards of the State educational agency, (C) in-
> clude an appropriate preschool, elementary, or second-
> ary school education in the State involved, and (D) are
> provided in conformity with the individualized education
> program required under section 1414(a)(5) of this title."
> 20 U. S. C. § 1401(18).

The majority reads this statutory language as establishing a
congressional intent limited to bringing "previously excluded
handicapped children into the public education systems of the
States and [requiring] the States to adopt *procedures* which
would result in individualized consideration of and instruction
for each child." *Ante,* at 189. In its attempt to constrict the
definition of "appropriate" and the thrust of the Act, the ma-
jority opinion states: "Noticeably absent from the language of
the statute is any substantive standard prescribing the level
of education to be accorded handicapped children. Certainly

the language of the statute contains no requirement like the one imposed by the lower courts—that States maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" *Ante*, at 189–190, quoting 483 F. Supp. 528, 534 (SDNY 1980).

I agree that the language of the Act does not contain a substantive standard beyond requiring that the education offered must be "appropriate." However, if there are limits not evident from the face of the statute on what may be considered an "appropriate education," they must be found in the purpose of the statute or its legislative history. The Act itself announces it will provide a *"full* educational opportunity to all handicapped children." 20 U. S. C. § 1412(2)(A) (emphasis added). This goal is repeated throughout the legislative history, in statements too frequent to be "'passing references and isolated phrases.'"[1] *Ante*, at 204, n. 26, quoting *Department of State* v. *Washington Post Co.*, 456 U. S. 595, 600 (1982). These statements elucidate the meaning of "appropriate." According to the Senate Report, for example, the Act does "guarantee that handicapped children are provided *equal* educational opportunity." S. Rep. No. 94–168, p. 9 (1975) (emphasis added). This promise appears throughout the legislative history. See 121 Cong. Rec. 19482–19483 (1975) (remarks of Sen. Randolph); *id.*, at 19504 (Sen. Humphrey); *id.*, at 19505 (Sen. Beall); *id.*, at 23704 (Rep. Brademas); *id.*, at 25538 (Rep. Cornell); *id.*, at 25540 (Rep. Grassley); *id.*, at 37025 (Rep. Perkins); *id.*, at

---

[1] The Court's opinion relies heavily on the statement, which occurs throughout the legislative history, that, at the time of enactment, one million of the roughly eight million handicapped children in the United States were excluded entirely from the public school system and more than half were receiving an inappropriate education. See, *e. g., ante*, at 189, 195, 196–197, n. 20. But this statement was often linked to statements urging equal educational opportunity. See, *e. g.*, 121 Cong. Rec. 19502 (1975) (remarks of Sen. Cranston); *id.*, at 23702 (remarks of Rep. Brademas). That is, Congress wanted not only to bring handicapped children into the schoolhouse, but also to benefit them once they had entered.

37030 (Rep. Mink); *id.*, at 37412 (Sen. Taft); *id.*, at 37413 (Sen. Williams); *id.*, at 37418–37419 (Sen. Cranston); *id.*, at 37419–37420 (Sen. Beall). Indeed, at times the purpose of the Act was described as tailoring each handicapped child's educational plan to enable the child "to achieve his or her maximum potential." H. R. Rep. No. 94–332, pp. 13, 19 (1975); see 121 Cong. Rec. 23709 (1975). Senator Stafford, one of the sponsors of the Act, declared: "We can all agree that education [given a handicapped child] should be equivalent, at least, to the one those children who are not handicapped receive." *Id.*, at 19483. The legislative history thus directly supports the conclusion that the Act intends to give handicapped children an educational opportunity commensurate with that given other children.

The majority opinion announces a different substantive standard, that "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." *Ante*, at 192. While "meaningful" is no more enlightening than "appropriate," the Court purports to clarify itself. Because Amy was provided with *some* specialized instruction from which she obtained *some* benefit and because she passed from grade to grade, she was receiving a meaningful and therefore appropriate education.[2]

---

[2] As further support for its conclusion, the majority opinion turns to *Pennsylvania Assn. for Retarded Children* v. *Commonwealth*, 334 F. Supp. 1257 (ED Pa. 1971), 343 F. Supp. 279 (1972) *(PARC)*, and *Mills* v. *Board of Education of District of Columbia*, 348 F. Supp. 866 (DC 1972). That these decisions served as an impetus for the Act does not, however, establish them as the limits of the Act. In any case, the very language that the majority quotes from *Mills*, *ante*, at 193, 199, sets a standard not of *some* education, but of educational opportunity equal to that of non-handicapped children.

Indeed, *Mills*, relying on decisions since called into question by this Court's opinion in *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1 (1973), states:

"In Hobson v. Hansen, [269 F. Supp. 401 (DC 1967),] Judge Wright found that denying poor public school children educational opportunity equal to

This falls far short of what the Act intended. The Act details as specifically as possible the kind of specialized education each handicapped child must receive. It would apparently satisfy the Court's standard of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child," *ante,* at 201, for a deaf child such as Amy to be given a teacher with a loud voice, for she would benefit from that service. The Act requires more. It defines "special education" to mean "specifically designed instruction, at no cost to parents or guardians, to *meet the unique needs* of a handicapped child . . . ." § 1401(16) (emphasis added).[3] Providing a teacher with a loud voice would not meet Amy's needs and would not satisfy the Act. The basic floor of opportunity is instead, as the courts below recognized, intended to eliminate the effects of the handicap, at least to the extent that the child will be given an equal opportunity to learn if that is reasonably possible. Amy Rowley, without a sign-language interpreter, comprehends less than half of what is said in the classroom—less than half of what normal children comprehend. This is hardly an equal opportunity to learn, even if Amy makes passing grades.

Despite its reliance on the use of "appropriate" in the definition of the Act, the majority opinion speculates that "Congress used the word as much to describe the settings in which

---

that available to more affluent public school children was violative of the Due Process Clause of the Fifth Amendment. *A fortiori,* the defendants' conduct here, denying plaintiffs and their class not just an equal publicly supported education but all publicly supported education while providing such education to other children, is violative of the Due Process Clause." 348 F. Supp., at 875.

Whatever the effect of *Rodriguez* on the validity of this reasoning, the statement exposes the majority's mischaracterization of the opinion and thus of the assumptions of the legislature that passed the Act.

[3] "Related services" are "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a handicapped child to benefit from special education." § 1401(17).

handicapped children should be educated as to prescribe the substantive content or supportive services of their education." *Ante,* at 197, n. 21. Of course, the word "appropriate" can be applied in many ways; at times in the Act, Congress used it to recommend mainstreaming handicapped children; at other points, it used the word to refer to the content of the individualized education. The issue before us is what standard the word "appropriate" incorporates when it is used to modify "education." The answer given by the Court is not a satisfactory one.

## II

The Court's discussion of the standard for judicial review is as flawed as its discussion of a "free appropriate public education." According to the Court, a court can ask only whether the State has "complied with the procedures set forth in the Act" and whether the individualized education program is "reasonably calculated to enable the child to receive educational benefits." *Ante,* at 206, 207. Both the language of the Act and the legislative history, however, demonstrate that Congress intended the courts to conduct a far more searching inquiry.

The majority assigns major significance to the review provision's being found in a section entitled "Procedural safeguards." But where else would a provision for judicial review belong? The majority does acknowledge that the current language, specifying that a court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate," § 1415(e)(2), was substituted at Conference for language that would have restricted the role of the reviewing court much more sharply. It is clear enough to me that Congress decided to reduce substantially judicial deference to state administrative decisions.

The legislative history shows that judicial review is not limited to procedural matters and that the state educational agencies are given first, but not final, responsibility for the

content of a handicapped child's education. The Conference Committee directs courts to make an "independent decision." S. Conf. Rep. No. 94–455, p. 50 (1975). The deliberate change in the review provision is an unusually clear indication that Congress intended courts to undertake substantive review instead of relying on the conclusions of the state agency.

On the floor of the Senate, Senator Williams, the chief sponsor of the bill, Committee Chairman, and floor manager responsible for the legislation in the Senate, emphasized the breadth of the review provisions at both the administrative and judicial levels:

> "Any parent or guardian may present a complaint concerning *any matter* regarding the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child. In this regard, Mr. President, I would like to stress that the language referring to 'free appropriate education' has been adopted to make clear that a complaint may involve matters such as questions respecting a child's individualized education program, questions of whether special education and related services are being provided without charge to the parents or guardians, questions relating to whether the services provided a child meet the standards of the State education agency, or *any other question* within the scope of the definition of 'free appropriate public education.' In addition, it should be clear that a parent or guardian may present a complaint alleging that a State or local education agency has refused to provide services to which a child may be entitled or alleging that the State or local educational agency has erroneously classified a child as a handicapped child when, in fact, that child is not a handicapped child." 121 Cong. Rec. 37415 (1975) (emphasis added).

There is no doubt that the state agency itself must make substantive decisions. The legislative history reveals that the

courts are to consider, *de novo*, the same issues. Senator Williams explicitly stated that the civil action permitted under the Act encompasses all matters related to the original complaint. *Id.*, at 37416.

Thus, the Court's limitations on judicial review have no support in either the language of the Act or the legislative history. Congress did not envision that inquiry would end if a showing is made that the child is receiving passing marks and is advancing from grade to grade. Instead, it intended to permit a full and searching inquiry into any aspect of a handicapped child's education. The Court's standard, for example, would not permit a challenge to part of the IEP; the legislative history demonstrates beyond doubt that Congress intended such challenges to be possible, even if the plan as developed is reasonably calculated to give the child some benefits.

Parents can challenge the IEP for failing to supply the special education and related services needed by the individual handicapped child. That is what the Rowleys did. As the Government observes, "courts called upon to review the content of an IEP, in accordance with 20 U. S. C. [§] 1415(e) inevitably are required to make a judgment, on the basis of the evidence presented, concerning whether the educational methods proposed by the local school district are 'appropriate' for the handicapped child involved." Brief for United States as *Amicus Curiae* 13. The courts below, as they were required by the Act, did precisely that.

Under the judicial review provisions of the Act, neither the District Court nor the Court of Appeals was bound by the State's construction of what an "appropriate" education means in general or by what the state authorities considered to be an appropriate education for Amy Rowley. Because the standard of the courts below seems to me to reflect the congressional purpose and because their factual findings are not clearly erroneous, I respectfully dissent.