**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTOPHER TERRY; LINDA BELL,
Plaintiffs-Appellants,

v.

NANCY S. GRASMICK, Ph.D., in her
official capacity as Maryland State
Superintendent of Schools; RICHARD J.
STEINKE, in his official capacity as
Assistant State Superintendent,
Division of Special Education; GAYLE
AMOS, in her official capacity as
Coordinator of Special Education
Programs, Correctional Education of
the Maryland State Department of
Education,

Defendants-Appellees.

ADVOCACY, INCORPORATED; CASA, of
Maryland; CENTER FOR LAW AND
EDUCATION; HOMELESS PERSONS
REPRESENTATION PROJECT; MARYLAND
COALITION FOR INCLUSIVE EDUCATION;
MEXICAN-AMERICAN LEGAL DEFENSE
AND EDUCATION FUND; NATIONAL
ASSOCIATION OF PROTECTION AND
ADVOCACY SYSTEMS; SAINT AMBROSE
LEGAL SERVICES; SOUTHERN POVERTY
LAW CENTER; YOUTH LAW CENTER; THE
ASSOCIATION OF PERSONS WITH SEVERE
HANDICAPS,
Amici Curiae.

No. 96-1801

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-95-1685-AMD)

Argued: May 5, 1997

Decided: June 3, 1997

Before NIEMEYER and MOTZ, Circuit Judges, and
STAMP, Chief United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Joseph Carter, CARR, GOODSON, LEE &
WARNER, P.C., Baltimore, Maryland, for Appellants. Andrew How-
ard Baida, Assistant Attorney General, Baltimore, Maryland, for
Appellees. **ON BRIEF:** Richard S. Gordon, CARR, GOODSON,
LEE & WARNER, P.C., Baltimore, Maryland; Lisa D. Pedersen,
Deborah M. Thompson, PUBLIC JUSTICE CENTER, INC., Balti-
more, Maryland, for Appellants. J. Joseph Curran, Jr., Attorney Gen-
eral of Maryland, JoAnn G. Goedert, Assistant Attorney General,
Baltimore, Maryland, for Appellees. Loren M. Warboys, YOUTH
LAW CENTER, San Francisco, California, for Amici Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

2

**OPINION**

PER CURIAM:

Christopher Terry and his mother, Linda Bell (collectively "Terry"), initiated this action to recover attorneys' fees and costs from Nancy Grasmick, the Maryland State Superintendent of Schools, and other state administrators (collectively "the State") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1415(e)(4) (West 1990 & Supp. 1997), and the Civil Rights Attorneys' Fees Award Act of 1976, as amended, 42 U.S.C.A. § 1988 (West 1994 & Supp. 1997). These attorneys' fees and costs were incurred in requesting and preparing for an administrative hearing to claim special education benefits under the IDEA. See Combs v. School Bd. of Rockingham County, 15 F.3d 357, 359 n.10 (4th Cir. 1994) ("The IDEA allows parties to bring an independent action to federal court solely to recover fees incurred in an administrative proceeding."). The parties filed cross-motions for summary judgment; the district court granted the State's motion and denied Terry's. The district court concluded that the undisputed, material facts demonstrated that Terry was not a prevailing party under this "[c]ircuit's interpretation of the applicable attorneys' fees statutes." Terry v. Grasmick, No. 95-1685, slip. op. at 1 (D. Md. May 7, 1996). We affirm.

I.

Terry, who was born on July 31, 1974, began his incarceration at the Maryland Correctional Training Center in February, 1994.* Pursuant to existing state policies and procedures, each inmate entering the training center who is under 21 years of age, is screened to determine whether he has a potential need for special education and related services. Prior to becoming incarcerated, Terry had a long history of receiving special education services.

Upon his arrival at the training center, an institutional screening committee interviewed Terry. He told the committee that he did not

_____

*Some immaterial facts, or inferences to be drawn from them, are disputed. Above we set forth those facts in the light most favorable to Terry.

3

possess a GED, that he had been held back in school, that he had deafness in one ear which affected his learning, that he had difficulty concentrating while in school due to a short attention span and "felt `dumb' at times," and that he had been placed in special education classes, which were generally small in size (15 or fewer students), "throughout the day, all day" for "all of[his] life." Terry's records also reveal that he was hyperactive. But Terry's test scores indicated that he might be capable of entering the prison system's high school equivalency program.

The screening committee placed Terry in a high school equivalency program conditionally, for an "observation period" of sixty days. The committee then sought Terry's educational records but was assertedly unable to obtain the records because Terry incorrectly identified the public school that he had previously attended. During the observation period, Terry appeared to make adequate academic progress and was interacting well with staff and peers. Accordingly, the screening committee continued Terry in the regular high school equivalency program on a long-term basis.

In November 1994, Terry withdrew from that program. In interviews with prison staff, he stated that he was withdrawing for "personal reasons." In January 1995 and February 1995, Terry requested an interview with a counselor. He was evaluated by a psychologist who found that Terry lacked close friends or family, displayed signs of depression and anger, and had formulated a suicide plan.

In February 1995, Terry retained the services of a non-profit public interest organization, the Public Justice Center, which in turn obtained the assistance of private counsel to aid Terry. A law clerk, working for the Public Justice Center, advised an education supervisor at the prison that she represented Terry (a local rule permits such representation by law students working under supervision of a member of the bar), that Terry's test scores indicated a potential for special education eligibility, that he had a history of special education services, and that he wished to receive special education services. The supervisor responded that Terry had not contacted any state official requesting special education services and that he needed to make a formal request to return "to the school waiting list."

4

On March 16, 1995, Terry -- through counsel -- formally requested that an administrative hearing be convened to consider the State's failure to screen and identify Terry as a student eligible for special education through the Admission, Review, and Dismissal (ARD) Committee process. In its response, the State suggested that an administrative hearing was "premature" and the matter would be resolved in the ARD Committee, which under state regulations determines whether a student is eligible for special education services. See Md. Regs. Code tit. 13A, § 05.01.08(E)(1)(c) (1996). If a student is deemed eligible, the ARD committee develops an individualized education program for the student, places the student in the program, and regularly reviews the student's progress in the program. See §§ 01.08(E)(2)(a), (2)(b), (3)(a).

Terry responded that he was entitled to an administrative hearing and planned to pursue the administrative hearing, but was amenable to and hoped to come to a resolution of the matter through the ARD committee process. Accordingly, the parties engaged in that process, with the request for an administrative hearing still pending.

When the ARD committee convened on April 11, 1995, with Terry and his counsel (but without any State lawyers), it agreed that Terry appeared potentially eligible for special education services. The committee considered information provided by Terry's counsel including Terry's prior special education records, which his counsel had been able to obtain with one telephone call to the Baltimore City schools. The committee drafted an interim individualized educational plan for Terry and began to provide services for him under the IDEA.

The ARD committee met with Terry and his counsel again in May and, as a result of that meeting, the committee provided Terry with an individualized educational plan that included all of the special education and related services that he had requested in his initial request for an administrative hearing. Since the matter was resolved, the Maryland Office of Administrative Hearings canceled the administrative hearing that had been scheduled for June 13, marking the matter "settled."

II.

Terry maintains on appeal, as he did in the district court, that he was a "prevailing party" pursuant to 20 U.S.C.A. § 1415(e)(4)(b) and

5

thus entitled to attorneys' fees. The crux of Terry's argument is that he repeatedly exhibited a need for, or sought, special education services that the State refused to provide him until he requested an administrative hearing, and that since, by requesting this hearing, he obtained all the relief he sought, he is a "prevailing party" entitled to attorneys' fees. There are several problems with this argument.

First, in this circuit we have determined that even if a plaintiff acts as a catalyst in obtaining desired government action, he is not a prevailing party and therefore not entitled to attorneys' fees unless he has obtained an enforceable judgment, settlement, or consent decree. See S-1 and S-2 v. State Bd. of Educ., 6 F.3d 160 (4th Cir. 1993) (Wilkinson, J., dissenting), vacated, 21 F.3d 49 (4th Cir. 1994) (en banc) (adopting panel dissent). Although S-1 involved an interpretation of 42 U.S.C. § 1988, we have held that a prevailing party has the same meaning under § 1415(e)(4)(B). See Combs , 15 F.3d at 360. Terry maintains that he obtained a favorable "settlement" of the case, however, he properly conceded in the district court that he obtained no formal "settlement agreement." Moreover, we have expressly held that a State's development of an individualized educational plan does not constitute a "settlement" for attorneys' fees purposes. See Combs, 15 F.3d at 360. Accordingly, it would seem that S-1 and Combs combine to prohibit recovery of attorneys' fees by Terry here.

However, as Terry points out, Combs is factually distinguishable from the case at hand. Thus, it may not foreclose a holding that, in appropriate circumstances, an individualized educational plan constitutes a settlement entitling a party to recover fees. After all Congress has mandated that local educators develop an individualized educational plan for each student with a disability. 20 U.S.C.A. § 1414(a)(5) (West 1990 & Supp. 1997). Federal law requires such a plan to be implemented "as soon as possible," 34 C.F.R. § 300.342(b)(2) (1996), and failure to comply with such a plan constitutes failure to provide an appropriate education, for which a disabled child is entitled to complain at a due process hearing. See State Bd. of Educ. v. Rowley, 458 U.S. 176, 203-05 (1982).

The difficulty for Terry is that even if, in certain circumstances, a party who obtains an individualized educational plan could be regarded as a prevailing party for attorneys' fees purposes, Terry has

6

failed to demonstrate that he is a prevailing party here. In order to be a prevailing party, to recover fees, even under a catalyst theory, a plaintiff must demonstrate a "dispute" with the government body or officer in which the plaintiff's position prevails. See Bonnes v. Long, 599 F.2d 1316, 1317 (4th Cir. 1979), overruled by S-1, 21 F.3d at 51 (rejecting catalyst theory). Thus, the State must have "denied" Terry something that he has requested. See S-1, 6 F.3d at 162. Terry cannot demonstrate that he and the State ever "disputed" his right to special educational services or that the State ever "denied" him those services once he requested them.

Terry asserts that the State repeatedly failed to comply with its obligations under the IDEA to identify, evaluate, and place children with disabilities. For example, Terry asserts that the screening committee unlawfully failed to refer him to an ARD committee when he entered the correctional institution in February 1994. He further asserts that the State failed in November of 1994 to recognize that his withdrawal from the regular education program was not for "personal reasons," as he said, but because of his need for special education services. Terry claims that the State failed again in January and February of 1995 to realize that when he requested psychological services because of his suicidal thoughts, Terry demonstrated a need for special education services.

Perhaps, in retrospect, Terry is correct. But the undisputed facts demonstrate that each of the State's actions at the time taken was, at the very least, reasonable. His equivocal test scores certainly permitted the initial placement. Then, for a number of months, Terry seemed to hold his own in the regular GED program. When he withdrew from that program, the State did question him as to his reasons for withdrawal and he never suggested that he needed or preferred special educational services. Similarly, when Terry requested counseling in January and February 1995, he never suggested that special educational service might ameliorate his depression. We do not hold that a disabled child or his parents must formally apply for special educational services before the State has any obligation to provide them. But, on the undisputed material facts here, we cannot hold that the State's failure to initially provide such services or to identify Terry's need for such services in November 1994, or in response to his

7

appeals for counseling in January and February 1995, constitutes a denial of such services.

Nor, contrary to Terry's assertions, do we believe the State denied his legal representative anything when the representative inquired, in February 1995, as to why Terry was not receiving special education services. Upon receipt of this inquiry, the State did (promptly) respond that Terry had never before asked for such services and that he should formally do so. This was not a denial but a solicitation for additional information. The State also told Terry's representative that if Terry made a formal application Terry would return "to the school's waiting list." However, the state employee, who spoke to Terry's representative, filed an affidavit stating that this waiting list includes all inmates seeking placement in any prison educational program and that if Terry had "requested placement or special education evaluation, he would have been placed in an educational program immediately." Terry presented no evidence controverting these assertions.

Finally, when, on March 16, 1995, Terry did formally request special education services and an administrative hearing at which to demonstrate the need for such services, the State denied him nothing. Rather it immediately acted to evaluate him and provide these services. In sum, Terry and the State never "disputed" his need for, or right to, an individualized educational plan or special education services.

This is not a case where the school system initially determined a student was ineligible for services under the IDEA and then changed its position after the student demanded a due process hearing. Cf. Angela L. v. Pasadena Indep. Sch. Dist., 918 F.2d 1188, 1191 (5th Cir. 1990) (school reverses earlier decision denying special education to child after parents requested due process hearing). The ADR committee's development of Terry's independent educational plan in the Spring of 1995, complete with special education services, did not constitute a "material alteration of the legal relationship between the parties." Farrar v. Hobby, 506 U.S. 103, 113 (1992). Thus, the district court was clearly correct in concluding that Terry was not entitled to attorneys' fees.

AFFIRMED

8