**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARK HARTMANN, a minor, by his
parents and next friends, Roxanna
Hartmann and Joseph Hartmann;
ROXANNA HARTMANN; JOSEPH
HARTMANN,
Plaintiffs-Appellees,

v.

LOUDOUN COUNTY BOARD OF
EDUCATION,
Defendant-Appellant,

and

EDGAR B. HATRICK; NED

WATERHOUSE,
Defendants.

VIRGINIA SCHOOL BOARDS
ASSOCIATION; TIDEWATER DOWN
SYNDROME ASSOCIATION; THE
ASSOCIATION FOR PERSONS WITH
SEVERE HANDICAPS, VIRGINIA
CHAPTER; THE ARC OF VIRGINIA;
SPINA BIFIDA ASSOCIATION OF
TIDEWATER; TIDEWATER ASSOCIATION
FOR HEARING IMPAIRED CHILDREN;
ENDEPENDENCE CENTER,
INCORPORATED;

No. 96-2809

THE VIRGINIA FOUNDATION FOR THE
EXCEPTIONAL CHILD AND ADOLESCENT;
GRAFTON SCHOOL, INCORPORATED;
PARENTS AND CHILDREN COPING
TOGETHER, INCORPORATED; NORTHERN
VIRGINIA CHAPTER OF THE AUTISM
SOCIETY OF AMERICA; CENTRAL
VIRGINIA CHAPTER OF THE AUTISM
SOCIETY OF AMERICA; PENINSULA
CHAPTER OF THE AUTISM SOCIETY OF
AMERICA; AUTISM TRAINING AND
FAMILY SUPPORT PROGRAM;
ATTENTION DEFICIT DISORDER
ASSOCIATION OF VIRGINIA; PENINSULA
ATTENTION DEFICIT DISORDER
ASSOCIATION;THE VIRGINIA INSTITUTE
OF AUTISM, INCORPORATED;
COMMONWEALTH COALITION FOR
COMMUNITY; LOUDOUN ASSOCIATION
FOR RETARDED CITIZENS; UNITED
STATESOF AMERICA,
<u>Amici Curiae.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-95-1686-A)

Argued: May 9, 1997

Decided: July 8, 1997

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and
COPENHAVER, United States District Judge
for the Southern District of West Virginia,
sitting by designation.

_____

Reversed and remanded with instructions to dismiss by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Luttig and Judge Copenhaver joined.

_____

**COUNSEL**

**ARGUED:** Kathleen Shepherd Mehfoud, HAZEL & THOMAS, P.C., Richmond, Virginia, for Appellant. Gerard Sale Rugel, Herndon, Virginia, for Appellees. **ON BRIEF:** James J. Wheaton, Charles B. Lustig, WILLCOX & SAVAGE, P.C., Norfolk, Virginia, for Amici Curiae Tidewater Down Syndrome Association, et al. John F. Cafferky, Kathryn Y. Aspegren, HUNTON & WILLIAMS, McLean, Virginia, for Amicus Curiae Virginia School Boards Association. Isabelle Katz Pinzler, Acting Assistant Attorney General, Mark L. Gross, Michelle M. Aronowitz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Judith A. Winston, General Counsel, Francisco Lopez, DEPARTMENT OF EDUCATION, Washington, D.C., for Amicus Curiae United States.

_____

**OPINION**

WILKINSON, Chief Judge:

Roxanna and Joseph Hartmann brought suit on behalf of their disabled son Mark against the Loudoun County Board of Education under the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. The Hartmanns alleged that the Board had failed to ensure that Mark was educated with non-handicapped children "to the maximum extent appropriate" as required by the IDEA's mainstreaming provision, 20 U.S.C. § 1412(5)(B). The district court agreed, rejecting the findings of both the local hearing officer and the state review officer. The Board appeals, contending that the court's decision is contrary to the law and the evidence in the record. We agree. As Supreme Court precedent makes clear, the IDEA does not grant federal courts a license to substitute their own notions of sound educational policy for those of local school authorities, or to disregard the findings developed in state administrative proceedings. Upon

3

careful review of the record, however, we are forced to conclude that
this is precisely what has occurred in this case. Accordingly, we
reverse and remand with directions to dismiss.

I.

Mark Hartmann is an eleven-year-old autistic child. Autism is a
developmental disorder characterized by significant deficiencies in
communication skills, social interaction, and motor control. Mark is
unable to speak and suffers severe problems with fine motor coordi-
nation. Mark's writing ability is extremely limited; he does not write
by hand and can consistently type only a few words such as "is" and
"at" by himself on a keyboard device known as a Canon communica-
tor. The parties agree that Mark's greatest need is to develop commu-
nication skills.

Mark spent his pre-school years in various programs for disabled
children. In kindergarten, he spent half his time in a self-contained
program for autistic children and half in a regular education class-
room at Butterfield Elementary in Lombard, Illinois. Upon entering
first grade, Mark received speech and occupational therapy one-on-
one, but was otherwise included in the regular classroom at Butter-
field full-time with an aide to assist him.

After Mark's first-grade year, the Hartmanns moved to Loudoun
County, Virginia, where they enrolled Mark at Ashburn Elementary
for the 1993-1994 school year. Based on Mark's individualized edu-
cation program (IEP) from Illinois, the school placed Mark in a regu-
lar education classroom. To facilitate Mark's inclusion, Loudoun
officials carefully selected his teacher, hired a full-time aide to assist
him, and put him in a smaller class with more independent children.
Mark's teacher, Diane Johnson, read extensively about autism, and
both Johnson and Mark's aide, Suz Leitner, received training in facili-
tated communication, a special communication technique used with
autistic children. Mark received five hours per week of speech and
language therapy with a qualified specialist, Carolyn Clement. Half-
way through the year, Virginia McCullough, a special education
teacher, was assigned to provide Mark with three hours of instruction
a week and to advise Mark's teacher and aide.

Mary Kearney, the Loudoun County Director of Special Education, personally worked with Mark's IEP team, which consisted of Johnson, Leitner, Clement, and Laurie McDonald, the principal of Ashburn. Kearney provided in-service training for the Ashburn staff on autism and inclusion of disabled children in the regular classroom. Johnson, Leitner, Clement, and McDonald also attended a seminar on inclusion held by the Virginia Council for Administrators of Special Education. Mark's IEP team also received assistance from educational consultants Jamie Ruppmann and Gail Mayfield, and Johnson conferred with additional specialists whose names were provided to her by the Hartmanns and the school. Mark's curriculum was continually modified to ensure that it was properly adapted to his needs and abilities.

Frank Johnson, supervisor of the county's program for autistic children, formally joined the IEP team in January, but provided assistance throughout the year in managing Mark's behavior. Mark engaged in daily episodes of loud screeching and other disruptive conduct such as hitting, pinching, kicking, biting, and removing his clothing. These outbursts not only required Diane Johnson and Leitner to calm Mark and redirect him, but also consumed the additional time necessary to get the rest of the children back on task after the distraction.

Despite these efforts, by the end of the year Mark's IEP team concluded that he was making no academic progress in the regular classroom. In Mark's May 1994 IEP, the team therefore proposed to place Mark in a class specifically structured for autistic children at Leesburg Elementary. Leesburg is a regular elementary school which houses the autism class in order to facilitate interaction between the autistic children and students who are not handicapped. The Leesburg class would have included five autistic students working with a special education teacher and at least one full-time aide. Under the May IEP, Mark would have received only academic instruction and speech in the self-contained classroom, while joining a regular class for art, music, physical education, library, and recess. The Leesburg program also would have permitted Mark to increase the portion of his instruction received in a regular education setting as he demonstrated an improved ability to handle it.

The Hartmanns refused to approve the IEP, claiming that it failed to comply with the mainstreaming provision of the IDEA, which

5

states that "to the maximum extent appropriate," disabled children should be educated with children who are not handicapped. 20 U.S.C. § 1412(5)(B). The county initiated due process proceedings, see 20 U.S.C. § 1415(b), and on December 14, 1994, the local hearing officer upheld the May 1994 IEP. She found that Mark's behavior was disruptive and that despite the "enthusiastic" efforts of the county, he had obtained no academic benefit from the regular education classroom. On May 3, 1995, the state review officer affirmed the decision, adopting both the hearing officer's findings and her legal analysis. The Hartmanns then challenged the hearing officer's decision in federal court.

While the administrative process continued, Mark entered third grade in the regular education classroom at Ashburn. In December of that year, the Hartmanns withdrew Mark from Ashburn. Mark and his mother moved to Montgomery County, Virginia, to permit the Hartmanns to enroll Mark in public school there. Mark was placed in the regular third-grade classroom for the remainder of that year as well as the next.[1]

The district court reversed the hearing officer's decision. The court rejected the administrative findings and concluded that Mark could receive significant educational benefit in a regular classroom and that "the Board simply did not take enough appropriate steps to try to include Mark in a regular class." The court made little of the testimony of Mark's Loudoun County instructors, and instead relied heavily on its reading of Mark's experience in Illinois and Montgomery County. While the hearing officer had addressed Mark's conduct in detail, the court stated that "[g]iven the strong presumption for inclusion under the IDEA, disruptive behavior should not be a significant factor in determining the appropriate educational placement for a disabled child." Loudoun County now appeals.

---

[1] Loudoun County contends that the Hartmanns do not present a valid case or controversy because Mark is currently in an educational placement which the Hartmanns find appropriate. Under the unusual circumstances of this case, this conclusion is not correct. There is no question that the Hartmanns would re-enroll Mark in Loudoun County if their suit

is successful. Specifically, the Hartmanns' expressed intent to return
Mark to school there is corroborated by the fact that Mark's father and
sister continue to occupy the family's home in Loudoun County.

6

II.

The IDEA embodies important principles governing the relation-
ship between local school authorities and a reviewing district
court.
Although section 1415(e)(2) provides district courts with authority
to
grant "appropriate" relief based on a preponderance of the
evidence,
20 U.S.C. § 1415(e)(2), that section "is by no means an invitation
to
the courts to substitute their own notions of sound educational
policy
for those of the school authorities which they review." Board of
Edu-
cation of Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S.
176, 206 (1982). Absent some statutory infraction, the task of
educa-
tion belongs to the educators who have been charged by society with
that critical task. Likewise, federal courts must accord "due
weight"
to state administrative proceedings. Id. Administrative findings in
an
IDEA case "are entitled to be considered prima facie correct," and
"the district court, if it is not going to follow them, is required
to
explain why it does not." Doyle v. Arlington County Sch. Bd., 953
F.2d 100, 105 (4th Cir. 1991).

These principles reflect the IDEA's recognition that federal courts
cannot run local schools. Local educators deserve latitude in
deter-
mining the individualized education program most appropriate for a
disabled child. The IDEA does not deprive these educators of the
right to apply their professional judgment. Rather it establishes
a
"basic floor of opportunity" for every handicapped child. Rowley,
458
U.S. at 201. States must provide specialized instruction and
related
services "sufficient to confer some educational benefit upon the
hand-
icapped child," id. at 200, but the Act does not require "the
furnishing
of every special service necessary to maximize each handicapped
child's potential," id. at 199.

In this same vein, the IDEA's mainstreaming provision establishes
a presumption, not an inflexible federal mandate. Under its terms,
dis-
abled children are to be educated with children who are not handi-
capped only "to the maximum extent appropriate." 20 U.S.C.
§ 1412(5)(B). Section 1412(5)(B) explicitly states that

mainstreaming
is not appropriate "when the nature or severity of the disability
is such
that education in regular classes with the use of supplementary
aids
and services cannot be achieved satisfactorily." 20 U.S.C.
§ 1412(5)(B); see also Rowley, 458 U.S. at 181 n.4.

7

III.

The district court's ruling strayed generally from the aforementioned principles. It diverged in particular from our decision in DeVries v. Fairfax County Sch. Bd., 882 F.2d 876 (4th Cir. 1989). In DeVries, we held that mainstreaming is not required where (1) the disabled child would not receive an educational benefit from mainstreaming into a regular class; (2) any marginal benefit from mainstreaming would be significantly outweighed by benefits which could feasibly be obtained only in a separate instructional setting; or, (3) the disabled child is a disruptive force in a regular classroom setting. Id. at 879. Although the district court failed to mention DeVries, its opinion suggests that none of these three categories describes Mark's situation. The district court found that Mark could receive substantial educational benefit in a regular classroom, that his disruptive behavior was not sufficient to justify a more segregated instructional setting, and that the Leesburg program would not have been an appropriate placement. After careful examination of the record, however, we are forced to conclude that the district court's decision fails to account for the administrative findings and is not supported by the evidence based on a correct application of the law. In effect, the court simply substituted its own judgment regarding Mark's proper educational program for that of local school officials.

A.

In finding that Mark could receive an educational benefit in a regular classroom, the district court disregarded both the hearing officer's finding and the overwhelming evidence that Mark made no academic progress in the regular second grade classroom at Ashburn. Mark's teacher testified, for example, that he was unable to retain skills: "once we thought he mastered [a math skill] and we left it alone and went onto another concept, if we went back to review, it seemed that he had forgotten." She confessed, "I felt like he lost a year in my classroom." Other Loudoun County personnel testified to the same effect. His speech therapist, for instance, stated that "[t]he only gain that I saw him make was in the one to one setting." The supervisor

for the county's program for autistic students likewise concluded, "I think there has been no progress academically in the inclusive settings;" "I think we're wasting his time." The hearing officer accord-

8

ingly found that "Mark made no measurable academic progress attributable to his placement in the regular classroom."

Mark's situation is similar to the one we faced in DeVries, 882 F.2d 876. In upholding Fairfax County's decision not to place Michael DeVries in Annandale High School, the court observed not only that Michael would derive virtually no academic benefit from the regular classroom, but also that his work would be at a much lower level than his classmates and that he would in effect "simply be monitoring classes." Id. at 879. Here the hearing officer made an identical finding, concluding that Mark "did not participate in the regular curriculum, but was provided his own curriculum." Mark's special education teacher in Loudoun County explained, "Mark needs a completely different program . . . . His skills have to be taught in a different way, in a different sequence, and even a different group of skills . . . from what his typical functioning peers are learning."

The district court acknowledged the testimony of Mark's second grade teacher regarding his lack of progress, but asserted that the hearing officer's conclusions were erroneous because the officer failed to give due weight to the testimony of Cathy Thornton, Mark's private tutor during second grade, and to Mark's first grade experience in Illinois. To the contrary, the administrative decisions took careful note of both. The hearing officer fully credited Thornton's testimony, finding that Mark made progress with both her and his speech therapist. The officer went further, however, and observed that both the tutoring and speech instruction occurred in a one-to-one setting outside of the regular class. In light of Mark's failure to progress in the regular classroom, the officer drew the only reasonable inference from this evidence, namely that separate instruction was precisely what Mark needed to make educational progress. As to Mark's experience in Illinois, the state review officer explained that the Illinois assessment of Mark's capabilities was flawed:

> [I]t became clear during the course of the second grade that Mark's academic skills were not as advanced as the Illinois school system thought. Mark cannot read and cannot add,

yet the Illinois teachers thought he was reading at first grade
level and progressing in the first grade math workbook. . . .
Mark apparently did not make the academic progress in first

9

grade the records forwarded to Loudoun County from Illinois indicated . . . .

While the district court opinion references the hearing officer's decision, its failure to address the administrative findings noted above simply does not reflect the teachings of <u>Rowley</u> and <u>Doyle</u> that state proceedings must command considerable deference in federal courts.

The district court also relied heavily on Mark's subsequent performance in the Montgomery County schools during fourth grade. While Montgomery County personnel did make some conclusory statements asserting that Mark made progress, the evidence is inconclusive at best. The district court pointed to math skills Mark demonstrated at the end of fourth grade, for example, but Mark was pulled out of the regular class for math instruction, just as Loudoun County had recommended. Any progress he made in math therefore simply supports the conclusion that separate, one-on-one instruction is appropriate for Mark. Mark also continued to receive speech therapy one-on-one, and his special education teacher in Montgomery County admitted that the county had no reliable method for assessing Mark's reading ability.

Finally, the district court pointed to perceived improvement in Mark's social skills due to interaction with his non-disabled peers. Any such benefits, however, cannot outweigh his failure to progress academically in the regular classroom. The mainstreaming provision represents recognition of the value of having disabled children interact with non-handicapped students. The fact that the provision only creates a presumption, however, reflects a congressional judgment that receipt of such social benefits is ultimately a goal subordinate to the requirement that disabled children receive educational benefit. Here the evidence clearly supports the judgment of the local education officials and the administrative hearing officers that Mark's educational progress required significant instruction outside of the regular classroom setting.

B.

The district court attributed Mark's lack of progress in Loudoun County to the county's alleged failure to make reasonable efforts to accommodate him in the regular classroom. We interpret this as a

rul-

10

ing that the county failed to provide the supplementary aids and ser-
vices contemplated by the IDEA's mainstreaming provision. 20 U.S.C. § 1412(5)(B).

The district court's conclusion is remarkable in light of the exten-
sive measures taken on Mark's behalf. The hearing officer found that Loudoun personnel were "enthusiastic" about including Mark at Ash-burn, a description fully supported by the record. The Ashburn princi-pal deliberately reduced the size of Mark's class and ensured that it was composed of students who were more independent and had higher level skills. Mark's teacher was selected because of her excel-lent teaching abilities, and the county hired a full-time, one-on-one aide for Mark. Mark received a full hour of speech and language instruction daily. Frank Johnson, the supervisor of the county's pro-gram for autistic children, provided assistance in behavior manage-ment throughout the year. Halfway through the year, the school's efforts increased when Virginia McCullough began providing special education services directly to Mark as well as advising Mark's teacher and aide. Inclusion specialists Gail Mayfield and Jamie Ruppmann consulted with the school during the fall, and Mark's teacher sought advice from other experts whose names were provided to her by the school or the Hartmanns. The teacher testified that she met constantly with Mark's aide, his speech therapist, the IEP team, and others to work on Mark's program -- daily at the beginning of the year and at least twice a week throughout.

The district court nonetheless found the county's efforts insuffi-cient. The court relied primarily on its conclusion that the Loudoun educators involved with Mark had inadequate training and experience to work with an autistic child.[2] The court found the credentials of two

---

[2] The court also concluded that Loudoun County's commitment to mainstreaming Mark lapsed at mid-year. Such a conclusion again does not take proper account of the administrative record as required by <u>Rowley</u> and <u>Doyle</u>. The hearing officer pointed out, for example, that the county actually <u>added</u> services for Mark in the second half of the year, when McCullough began providing special education instruction to Mark. Moreover, the hearing officer noted that the IEP prepared by

Mark's team in March -- three months after the county allegedly gave
up on mainstreaming him -- called for retaining him in the regular class-
room.

groups to be lacking. Neither the special education professionals nor
the regular education instructors were deemed properly qualified. The
conclusion that Mark had inadequately trained personnel developing
and implementing his program, however, is irreconcilable with either
the law or the record.

As to special education personnel, the district court concedes that
the individuals working with Mark during the first half of the year,
Mary Kearney and Jamie Ruppmann, were fully competent to assist
him. Kearney led Mark's IEP team, while Ruppmann provided con-
sultation services. In addition to serving as the county Director of
Special Education, Kearney had participated in the Virginia Systems
Change Project, a two-year state program on mainstreaming which
involved selected schools from across the state. Ruppmann is an
experienced, highly qualified consultant.

During the second half of the year, Frank Johnson led the IEP
team, and Virginia McCullough provided Mark with special educa-
tion services. The district court rejected their qualifications, asserting,
for example, that Johnson's credentials were clearly inadequate
because they were inferior to those of Kearney and Ruppmann. How-
ever, in addition to serving as the supervisor of Loudoun County's
program for autistic children, Johnson had a special education masters
degree, did graduate work with an autistic child, worked directly with
approximately ten autistic children as a teacher, and had attended spe-
cial education courses and seminars relating to autism throughout his
professional career. Both McCullough`s early childhood degree pro-
gram and her work in Loudoun County focused specifically on inte-
grating children with disabilities into the regular classroom.

To dismiss Johnson's and McCullough's qualifications is to adopt
exactly the sort of potential-maximizing standard rejected by the
Supreme Court in Rowley. We think the Court's admonition that the
IDEA does not require "the furnishing of every special service neces-
sary to maximize each handicapped child's potential," Rowley, 458
U.S. at 199, encompasses the notion that the IDEA likewise does not
require special education service providers to have every conceivable
credential relevant to every child's disability. Not all school systems
will have the resources to hire top-notch consultants, nor will every

school have the good fortune to have personnel who were involved

12

in a major state program related to the needs of every disabled child.
We note that in Virginia, there is no certification for autism. Further-
more, at the time of the trial, Loudoun County had eleven autistic children in a total school population of approximately 20,000 students. In this light, Johnson's experience teaching ten autistic children was substantial. Johnson and McCullough were clearly qualified to work with Mark as special educators, even accepting the district court's assertion that Ruppmann and Kearney had better credentials.

The suggestion that the regular education instructors, Mark's teacher and aide, were not adequately qualified also does not survive close scrutiny. Diane Johnson was an experienced professional properly certified under state law, and Virginia law does not require teaching assistants to be certified. Furthermore, Johnson and Leitner both obtained special training to work with Mark. Both received in-service instruction and attended an outside seminar on inclusion of disabled children in the regular classroom. They also were trained in facilitated communication, a special communication method used with Mark in Illinois.

To demand more than this from regular education personnel would essentially require them to become special education teachers trained in the full panoply of disabilities that their students might have. Virginia law does not require this, nor does the IDEA. First, such a requirement would fall afoul of Rowley's admonition that the IDEA does not guarantee the ideal educational opportunity for every disabled child. Furthermore, when the IDEA was passed,"Congress' intention was not that the Act displace the primacy of States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped." Rowley, 458 U.S. at 208. The IDEA "expressly incorporates State educational standards." Schimmel v. Spillane, 819 F.2d 477, 484 (4th Cir. 1987). We can think of few steps that would do more to usurp state educational standards and policy than to have federal courts re-write state teaching certification requirements in the guise of applying the IDEA.

In sum, we conclude that Loudoun County's efforts on behalf of

Mark were sufficient to satisfy the IDEA's mainstreaming directive.

13

C.

The district court also gave little or no weight to the disruptive effects of Mark's behavior in the classroom, stating that "[g]iven the strong presumption for inclusion under the IDEA, disruptive behavior should not be a significant factor in determining the appropriate educational placement for a disabled child." This statement simply ignores DeVries, where we specifically held that mainstreaming is inappropriate when "the handicapped child is a disruptive force in the non-segregated setting." 882 F.2d at 879 (quoting Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983)). In this case, disruptive behavior was clearly an issue. The hearing officer summarized:

> [Mark's] misbehaviors include continual vocalization, especially whining, screeching and crying when unhappy or frustrated, hitting, pinching, kicking, biting, sucking the leg of a chair, rolling on the floor, and removing his shoes and clothing. Mark is a big strong child who cannot be easily restrained when he engages in injurious behaviors such as hitting, kicking, pinching and biting. His continual vocalizations are distracting and make it difficult for other children to stay on task. When Jamie Ruppmann observed Mark in his classroom, she observed two instances of significant disruption, in which he threw himself on the floor. She noted that in each instance it took about five to eight minutes to get Mark settled down. His loud screeching outbursts, which occur daily, take the attention of the teacher and the aide to redirect him; these outbursts also take the other children off task and they then have to be redirected. Mark hits and pinches others several times a day.

While the hearing officer did not find Mark's disruptive behavior by itself to be dispositive, the attention she gave to Mark's conduct was entirely appropriate, indeed required, under DeVries.

D.

The district court also found that Leesburg would not have been an appropriate placement. This conclusion generally derived from the same analysis that led to the court's determination that Mark should

14

remain in the regular classroom. To the contrary, we hold that the pro-posed Leesburg placement was carefully tailored to ensure that he was mainstreamed "to the maximum extent appropriate." 20 U.S.C. § 1412(5)(B). Leesburg was a regular elementary school. Responding to Mark's lack of academic progress in the regular classroom, the May IEP would have placed Mark in the self-contained class for his academic subjects, while including him with his non-disabled peers for all other school activities such as art, music, and physical educa-tion. To promote the success of this partial mainstreaming, the hear-ing officer required the school to have an aide or teacher accompany Mark whenever he was in the regular classroom environment and to place Mark with the _same_ regular education class for all his non-academic activities.

IV.

This is not a case which either the local educational authorities or the reviewing administrative officers took lightly. We have sketched in great detail the efforts that Loudoun County made to provide Mark Hartmann with a suitable education. Furthermore, the administrative review process could not have been more thorough. The hearing offi-cer heard testimony from eighteen witnesses over a two month period and made detailed factual findings regarding all aspects of Mark's educational experience. The officer's analysis carefully incorporated those findings and specifically addressed the evidence the Hartmanns presented in support of their position. The district court, however, set all this extensive effort and review at nought. The court failed to men-tion, let alone discuss, critical administrative findings inconsistent with its conclusions. While making much of the credentials and credi-bility of witnesses endorsing full inclusion, the court gave little or no attention to the testimony of Loudoun professionals. In some instances the court, without listening to local educators, discounted their views despite the fact that the hearing officer had found them credible. One Loudoun official was dismissed outright as "a philo-sophical opponent of inclusion" for daring to state that he saw no evi-dence that Mark had progressed in the regular classroom.

The IDEA encourages mainstreaming, but only to the extent that it does not prevent a child from receiving educational benefit. The evidence in this case demonstrates that Mark Hartmann was not mak-

15

ing academic progress in a regular education classroom despite the provision of adequate supplementary aids and services. Loudoun County properly proposed to place Mark in a partially mainstreamed program which would have addressed the academic deficiencies of his full inclusion program while permitting him to interact with non-handicapped students to the greatest extent possible. This professional judgment by local educators was deserving of respect. The approval of this educational approach by the local and state administrative officers likewise deserved a deference from the district court which it failed to receive. In rejecting reasonable pedagogical choices and disregarding well-supported administrative findings, the district court assumed an educational mantle which the IDEA did not confer. Accordingly, the judgment must be reversed, and the case remanded with directions to dismiss it.

REVERSED AND REMANDED

16