**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

D.B., a minor, by and through his
mother Elizabeth Brinson;
ELIZABETH BRINSON, mother of minor
D.B., and on her own behalf,
Plaintiffs-Appellants,

v.

CRAVEN COUNTY BOARD OF

EDUCATION; WILLIAM RIVENBARK,
Superintendent of the Craven
County Schools, in his official
capacity; CARROLL IPOCK, JR.,
Chairman of the Craven County
Board of Education, in his official
capacity,
Defendants-Appellees.

No. 99-1326

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Alexander B. Denson, Magistrate Judge.
(CA-97-118-4-DE)

Argued: February 28, 2000

Decided: April 3, 2000

Before NIEMEYER, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion,
in which Judge Williams and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Peter W.D. Wright, Deltaville, Virginia, for Appellants. Ann L. Majestic, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Stacey B. Bawtinhimer, New Bern, North Carolina, for Appellants. Elaine M. Whitford, THAR-RINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

NIEMEYER, Circuit Judge:

DeWitt Brinson, now a high-school senior in the North Carolina public-school system, was diagnosed in seventh grade with a learning disability that primarily affected his writing skills. Although the school system provided Brinson with an individualized education program to accommodate this disability, his parents challenged the sufficiency and merit of the individualized education program under the Individuals with Disabilities Education Act. After the Brinsons' challenge was rejected in the North Carolina administrative process, the Brinsons filed this action in the district court seeking a broad array of remedies. The district court again rejected their challenge, concluding that the school system complied with the Individuals with Disabilities Education Act and provided DeWitt Brinson with an individualized education program that was designed to provide him with a free appropriate public education. It also concluded that the program met the North Carolina standard that "a handicapped child should be given an opportunity to achieve his full potential commensurate with that given other children." We affirm.

I

When DeWitt Brinson ("DeWitt") began kindergarten in the Craven County School System ("School System") in New Bern, North

Carolina in 1987, school officials noted that DeWitt had difficulties in writing. DeWitt's parents placed him in a private school until the middle of fifth grade. DeWitt earned primarily Bs and Cs in the private school, and his handwriting did not improve. DeWitt then returned to the School System for the second half of fifth grade, where, during the completion of fifth grade, he continued to receive mostly Bs and Cs. His teacher gave him a B in handwriting, noting that his writing was legible but "needs attention." In sixth grade, DeWitt received "satisfactory" marks.

In October 1994, when DeWitt was in seventh grade, his teachers requested a conference with his parents because DeWitt was not completing his work. Mrs. Brinson said that DeWitt was bored and that "she had a hard time getting him to do things at home if it was something that he didn't want to do," but "if it was something that he wanted to do, it wasn't a problem." A school psychologist who tested DeWitt concluded that he had superior skills in verbal comprehension, reading, and math; he was average in perceptual organization and writing; and he had possible problems in attention and focus. While his IQ scores ranged from the 58th percentile to the 96th, his written language score was in the 27th percentile and his assignment completion rate was below 80%. The psychologist ultimately recommended that DeWitt be considered for both academically gifted and learning-disabled service. DeWitt was also tested by an occupational therapist, who found that DeWitt had "some weaknesses in the areas of upper limb speed and dexterity" and that he would benefit from relearning how to write cursive from a "kinesthetic approach."

School officials met with DeWitt's parents to develop an individualized education program ("IEP") that addressed both his talents and his disability. Accordingly, his IEP, which was finalized on March 14, 1995, included both learning disabled and academically gifted components. The learning-disabled portion indicated that DeWitt's "present level of performance" included above average intelligence, math skills, and reading skills, below average written language skills, and an assignment-completion rate below 80%. It specified special-education services lasting for one year from February 28, 1995. The section for short-term goals called for DeWitt to pass all tests with 80% to 90% accuracy when given extended time and to complete written assignments with greater than 80% accuracy through use of

3

a computer and NCR paper. The section for annual goals called for DeWitt to "complete regular education courses using the standard course of study" through consultation with the learning-disability teacher. DeWitt was also authorized to have preferred seating and use a tape recorder and graph paper. The academically gifted portion of the IEP, meanwhile, identified steps to improve DeWitt's "higher level cognitive processes" and called for "shortened written assignments and extended time as needed." At the request of Mrs. Brinson, DeWitt's teachers modified the IEP to alter the procedure for the end-of-grade testing.

DeWitt completed seventh grade with "satisfactory" scores, and he improved in at least four out of six classes over the academic year.

Shortly after DeWitt started eighth grade in August 1995, Mrs. Brinson sent the School System the results of a neurological test, which recommended that the School System not push DeWitt to improve his coordination and handwriting and that it minimize his need for handwriting by letting him take oral tests or use a computer.

During eighth grade, DeWitt's performance deteriorated, and by the end of the semester he was failing three or four subjects, including Algebra, one of the areas in which he had been identified as gifted. He did not make up tests he missed and had not turned in a number of homework assignments. In one class he returned no assignments for the first 18 weeks. During this period, Mrs. Brinson refused several requests for a conference because "there wasn't any need."

In January 1996, DeWitt's IEP was modified to include access to more resources and extended test time. His teachers also altered some assignments and used a chart to keep track of his homework. While DeWitt began handing in more assignments, these were ones that he completed at school because "if [an assignment] ever went home [the teacher] never saw it again."

Mrs. Brinson arranged for DeWitt's IEP to be reviewed by Dr. Rebecca Felton, a special-education expert. After Dr. Felton examined DeWitt's IEP and various records, she concluded that the IEP "contained some appropriate objectives" but that it was "not sufficient to meet [DeWitt's] needs." While some of her recommendations con-

4

cerned clarifications of services already included in the IEP, she also made some additional suggestions. She specifically recommended additions in the areas of written expression and attentional problems and stated that "writing by hand should be strictly limited." She recommended clarification of what it meant to use NCR paper, a tape recorder, overheads, and a spell-checker. The recommendations of Dr. Felton were presented at the annual IEP meeting, and the IEP was modified to include those not already being fulfilled.

Toward the end of the second semester of eighth grade, DeWitt's teachers again became concerned that he would fail, in large part because he was again not completing assignments. This was in spite of the fact that his teachers, for example, cut articles from newspapers for him to read -- rather than making him look them up himself, as the particular assignment required -- and provided access to a computer. Mrs. Brinson declined to meet to discuss the situation, and when the teachers sent home a packet of assignments that DeWitt needed to complete, they were never returned. Nevertheless, DeWitt did pass eighth grade. On his end-of-grade writing assessment test, DeWitt received a score of 3.5 out of 4.0 for his composing skills. His paper had a "reasonable, acceptable level of proficiency on sentence formation, usage, and mechanics." Further, his reading and mathematics grades were in the 91st and 87th percentiles, respectively.

Prior to the completion of eighth grade, Mrs. Brinson elected to challenge the School System's efforts under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.§ 1400 et seq., and requested a special education due-process hearing. She stated that the School System had failed to implement the effective portions of DeWitt's IEPs and that the IEPs had failed to improve DeWitt's school performance. In preparation for this hearing, she had Dr. Felton again review DeWitt's writing skills. Dr. Felton concluded that DeWitt continued to have difficulties in written expression but that he should use a keyboard rather than be taught handwriting directly. Mrs. Brinson also had Amy Staples, who had a master's degree in educational psychology, review the IEPs. Staples concluded that some of the IEPs' goals were clear but that some portions of the IEPs seemed to be striving for goals not specified. On various written tests performed by Staples, DeWitt's writing ranged between a fourth- and seventh-grade level. Mrs. Brinson also had DeWitt evaluated by a

5

psychologist, who determined that, while DeWitt had high average intelligence, he was weak in thinking speed and motor speed. The psychologist recommended "less emphasis upon handwriting."

The due-process hearing was held before a North Carolina Administrative Law Judge ("ALJ"), who heard testimony from fifteen witnesses and reviewed a number of exhibits. The ALJ's opinion, issued six months later, adopted "in their entirety" the 209 proposed findings of fact and 35 conclusions of law proposed by the Brinsons' lawyer. The ALJ concluded that the School System failed to provide DeWitt with a free appropriate public education and did not consistently implement his IEPs. A neuropyschologist who tested DeWitt after the hearing found that "[m]any of the modifications offered by the school system appear quite appropriate" and recommended that "[a]ny timed written demands should be minimal" and that written exams should be modified.

The School System appealed the ALJ's decision to a hearing review officer for the state board of education. The review officer, who heard no evidence, reversed the ALJ's decision as well as 67 findings of fact and 28 conclusions of law. The review officer determined that the School System timely identified DeWitt as having a learning disability and that the IEPs were reasonably calculated to provide, and did provide, DeWitt with a free appropriate public education. The Brinsons challenged this decision by commencing this action in the district court.

The district court recognized that as a general matter it was required to defer to the ALJ and the review officer, even though their decisions conflicted. But because the ALJ adopted in toto the findings of fact and conclusions of law prepared by the Brinsons' counsel, the court gave greater deference to the review officer who undertook an independent analysis of the record. After receiving some additional evidence, the court concluded that the School System had not denied DeWitt a free appropriate public education under either federal or state law because it had provided him with IEPs reasonably calculated to lead to educational benefit. From judgment entered in favor of the School System, the Brinsons noted this appeal.

II

The IDEA requires that "all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d). This education is tailored to meet the needs of a handicapped child by an "individualized education program" ("IEP"). 20 U.S.C. § 1401(11). The IEPs must contain statutorily specified elements, see 20 U.S.C. § 1414(d), and be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade," Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 204 (1982) (footnote omitted).

In reviewing state administrative proceedings in an IDEA case, courts must make an "independent decision based on a preponderance of the evidence, while giving due weight to [the] state administrative proceedings." Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991) (citations omitted). When the decisions of administrative hearing officers and review officers conflict, "due weight" is generally given to the administrative hearing by according the hearing officer's findings of fact a rebuttable presumption of prima-facie correctness. Id. at 105. But in particular circumstances, reviewing courts may defer to the findings of the review officer rather than those of the hearing officer, such as where (1) the review officer's decision does not turn on witness credibility but on the weight of the evidence, or (2) the hearing officer's opinion is cursory and conclusory, or (3) the review officer provides reasons for departing from the hearing officer's findings. See Springer v. Fairfax County Sch. Bd., 134 F.3d 659, 663 n.* (4th Cir. 1998).

In the case before us, the Brinsons challenge not only the merits of the state review officer's decision approving the School System's IEP for DeWitt and the district court's affirmance of that decision, but also the procedural basis on which the district court gave deference to the review officer's decision. We address this latter point first.

A

The ALJ's decision in this case amounted to the wholesale adoption of the findings of fact and conclusions of law proposed by the Brinsons' counsel, including typographical errors. There is no evi-

7

dence that the ALJ provided any independent evaluation of the witnesses' credibility or analysis of the issues. These facts alone suggest a cursory or conclusory decision by the ALJ that merits little or no deference.

Moreover, the decision of the state review officer is a reasoned analysis that provides a rational basis for departing from the ALJ's decision. He discussed the record and provided reasons for the weight he gave particular evidence. He noted that because many of the findings of the ALJ "were inconsistent with the record or not relevant," he "had to independently determine Findings of Fact from the record and develop his own Conclusions of Law." On occasion, the record provided him with a basis to conclude that witnesses presented their opinions with a bias. For example, he noted that one doctor who evaluated DeWitt "entered into her role with a definite bias that the school system was wrong and did not perform her `evaluation' in an objective manner" because the doctor "did not talk with any of [DeWitt's] teachers, observe him in school, or obtain samples of school work."

Accordingly, we are satisfied that the district court properly gave due weight to the state administrative proceedings by deferring to the findings and conclusions of the state review officer. See Springer, 134 F.3d at 663 n.*.

B

In reviewing the merits, we must determine whether the School System provided DeWitt with IEPs that were reasonably calculated to enable him to obtain a free appropriate public education. See Rowley, 458 U.S. at 203-07; see also Harrell v. Wilson County Sch., 293 S.E.2d 687, 690 (N.C. Ct. App. 1982) (articulating North Carolina requirement that "a handicapped child should be given an opportunity to achieve his full potential commensurate with that given other children" (footnote omitted)). DeWitt contends that the IEPs did not provide a free appropriate public education because they do not contain objective goals or means of assessing improvement; they do not address the needs identified by the School System; and they do not address his difficulties in handwriting. He specifically argues that his needs were for "training and teaching to remediate his written lan-

8

guage disability," and that the School System did not provide IEPs to address this problem.

Since the time DeWitt returned to the School System in the fifth grade, he has been evaluated by seven professionals in the fields of education and medicine. Of these, four specifically recommended that the School System minimize the amount of writing required of DeWitt, because such exercises would be counterproductive. The only expert who disagreed was the occupational therapist who evaluated DeWitt in seventh grade, finding that he should relearn cursive. The majority of those consulted recommended alternate means to allow completion of assignments that were normally handwritten. The School System followed these recommendations by providing tools to reduce the need for handwriting, including computers and tape recorders. It also modified tests and provided longer amounts of time for DeWitt to complete them. In implementing these steps, the School System followed the advice of professionals, which was designed to minimize the effect that DeWitt's handwriting deficiency might have on his academic performance.

Moreover, DeWitt's performance did improve significantly through eighth grade, including in the area of handwriting. On his writing assessment test for the end of eighth grade, DeWitt received a 3.5 on a 4.0 scale for his composing skills, up from 2.5 prior to the initiation of special-education services. His paper was found to have demonstrated a "reasonable, acceptable level of proficiency on sentence formation, usage, and mechanics."

The evidence indicates that, to the extent DeWitt struggled academically, a substantial contributing factor was his failure to turn in assignments and make up missed tests, even when no handwriting was involved. For example, he often did not turn in his stock-report assignments, which required looking up a stock in the newspaper weekly and recording its performance. When the teachers assembled a packet of work to be done at home, usually it was never returned. But DeWitt did "very well" in the assignments in which he was interested, including a parchment-letter project, which involved writing and for which he in fact performed extra work.

Contrary to the Brinsons' assertion, DeWitt's IEPs do contain specific goals and means to assess his performance. They set objectives

9

for tests and for writing performance, and they provide means with which to evaluate DeWitt's progress, including daily charts, close observation by teachers, and review of notebooks and portfolios. The IEPs also provide for tools such as computers, tape recorders, and graph and NCR paper to facilitate attainment of stated goals. Any deficiency in the IEPs cannot be said to have denied DeWitt a free appropriate public education, see 20 U.S.C.§ 1400(d), or diminished his "opportunity to achieve his full potential commensurate with that given other children," Harrell, 293 S.E.2d at 690 (footnote omitted). On the contrary, the record shows that the IEPs were reasonably calculated to enable DeWitt to advance from grade to grade. While DeWitt's writing skills still may not be as strong as would be desirable, the law requires schools to provide educational opportunities, not guarantees that every child will attain his full potential.

The judgment of the district court is therefore affirmed.

AFFIRMED

10