The Honorable Shane Broadway State Senator 201 Southeast Second Street Bryant, Arkansas 72022-4025
Dear Senator Broadway:
I am writing in response to your request for an opinion concerning the definition of a "school bus" in Act 999 of 2007 and whether that Act applies to a particular vanpool operation that is transporting pupils to the Arkansas Schools for the Blind and Deaf. You state the following information and pose the following question:
 I was contacted by State Employees Benefit Corporation (SEBCO) concerning an interpretation of Act 999 of 2007. Act 999 clarifies the definition of "school bus."
 SEBCO operates a vanpool program which provides transportation from local communities to Little Rock. This program began in 1979 for state employees, but over the years has expanded to include non-state employees. Participants pay a fee to reserve a seat.
 During the 2006-2007 school year, the vanpool transported five students from five different communities to the School for the Blind and School for the Deaf. The rider fees were paid by the local school district. Students from the School for the Deaf or Blind have been riding the vans for over ten years. The program uses 12 and 15 passenger vans. *Page 2 
With this background, my question to you is:
 Does Act 999 apply to the vanpool program operated by the State Employees Benefit Corporation?
RESPONSE
I am somewhat uncertain, as an initial matter, as to the exact focus of your question. I assume, because Act 999 revises the definition of "school bus" in several different sections of the Arkansas Code relating to school bus safety features, that you are inquiring whether those particular sections of the Code now apply to require those same safety features of the vanpool program's transport of students, assuming it falls within the newly amended definition. Although the vanpool program you describe may fall within the literal definition of "school bus" as used in the statutes amended by Act 999 (to the extent the vanpool is "[p]rivately owned and operated for compensation for the transportation of students to or from school or school-sponsored activities. . . ."), in my opinion this definition would in all likelihood not be construed as including a mixed-use vanpool under the facts you describe. Case law from other jurisdictions supports the argument that a mixed use vehicle may be outside the definition of "school bus" if not used "primarily" or "exclusively" for the transport of students. That determination would, of course, involve an analysis of all the facts surrounding the particular transportation in question. In addition, the analysis is not as simple as determining whether the vanpool program falls within the new state law definition, because the students being transported to the Schools for the Blind and Deaf are covered by a federal law, the "Individuals with Disabilities in Education Act," ("IDEA"). Under that law, public educational agencies are required to provide transportation services to disabled students under the "individual education plan" ("IEP") created for each student. The provisions of federal law do not invariably require the transport of such students on "school buses" under a student's individual education plan. It is clear that school districts can contract for varying modes of transportation to comply with the IDEA. A question nonetheless arises as to whether local school officials have the authority to designate a mode of transportation in an IEP if that mode of transportation is a mixed-use vehicle designed to seat over ten passengers and does not meet the state specifications for a regulation school bus. I have not found any state or federal authority on that precise question. State law, as discussed above, may therefore be controlling. *Page 3 
Act 999 of 2007 is entitled "An Act to Clarify the Definition of School Bus Under the Arkansas Code; and for Other Purposes." It amended several provisions of the Arkansas Code relating to the operation of school buses. Most of the amendments revise the definition of "school bus," so as to make it the same in the sections amended. Specifically, the Act amends: A.C.A. § 6-19-110 (requiring the loading and discharging of passengers at the extreme right side of the road); A.C.A. § 6-19-117
(regarding the equipping of school buses with flashing white strobe lights and crossing gates); A.C.A. § 6-19-119 (prohibiting the operation of a school bus until all passengers are seated); A.C.A. § 6-19-222 (regarding a comprehensive maintenance program for all public "school buses"); and A.C.A. § 27-49-219(e) (providing a definition of "school bus" in the "Uniform Act Regulating Traffic on Highways of Arkansas"). Each of the Act's provisions that amend the definition of "school bus" define that term as:
 (1) A motor vehicle designed to carry more than ten (10) passengers:
 (A) Owned by a public or governmental agency or private school and operated for the transportation of students to or from school or school-sponsored activities; or
 (B) Privately owned and operated for compensation for the transportation of students to or from school or school-sponsored activities; and
 (2) A motor vehicle designed to carry more than twenty-five (25) passengers is exempt from this section if the motor vehicle is:
 (A) Owned by a public or governmental agency or private school and operated for the transportation of students to or from school-sponsored activities but not used to transport students on any scheduled school bus route; or
 (B) Privately owned and operated for compensation under contract to a school district and used for the transportation of students to or from school-sponsored activities. *Page 4 
As can be seen from the above, a "school bus" is designed to carry more than ten passengers. You state that the vanpool program in question uses twelve and fifteen-seat passenger vans. The vans are thus designed to carry more than ten passengers.
With regard to the next portion of the above definition, you do not state who owns the vans in question, but I assume that they are owned by the State Employees Benefit Corporation ("SEBCO"). That corporation is listed in the records of the Secretary of State as a private for-profit corporation. See www.sosweb.state.ar.us. The vans are thus owned by a private entity (and not a school). If they fit within the definition of a "school bus," it would only be pursuant to subsection (1)(B) above, which includes vehicles that are "[p]rivately owned and operated for compensation for the transportation of students to or from school or school-sponsored activities. . . ." Finally, the exemptions provided in subsection (2)(A) and (B) above do not apply because they exempt only motor vehicles "designed to carry more than twenty-five (25) passengers" and only to "school-sponsored activities" not to and from school.
On its face, therefore, the vanpool program you describe might be said to fit within the definition of a "school bus" for purposes of the statutes amended by Act 999 of 2007. Again, that Act requires certain procedures for loading and unloading passengers; strobe lights and crossing gates; and restricts operation of school buses until all passengers are seated. This is true at least to the extent that the vanpool program can be described as "[p]rivately owned and operated for compensation for the transportation of students to or from school or school-sponsored activities. . . ."
It might be argued as an initial matter, however, that the word "school" as used in the applicable definition is not broad enough to include transportation of students to the Arkansas Schools for the Blind and Deaf. These institutions are unquestionably "schools," but they are not under the jurisdiction of local school districts. They are, rather, state agencies engaged in the education of students with discrete types of disabilities. Special statutes exist relating to the transportation of students by these state schools. See, e.g., A.C.A. § 6-43-112
(authorizing the Schools for the Blind and Deaf to "transport students to and from school in chartered vehicles which are licensed to do business in the State . . . and which meet minimum safety standards established by the federal Department of Transportation"). In this case, however, the Schools for the Blind and Deaf are apparently not undertaking the duty of transporting the students. The local school districts are paying the rider fees and are providing the vanpool transportation. *Page 5 
The special statutes governing transportation of students by the Schools for the Blind and Deaf are thus presumably inapplicable. The question remains, therefore, whether the statutes amended by Act 999 of 2007 apply to local school districts' providing of transportation "to and from" the Schools for the Blind and Deaf as opposed to schools in local school districts. I have found no generally applicable statutory definition of the word "school." One of the most basic rules of statutory interpretation, however, is that in the absence of an ambiguity, statutory language must be given its common meaning in ordinary usage.See, e.g., Bourne v. Board Of Trustees, 347 Ark. 19, 59 S.W.3d 432
(2001); Arkansas County v. Desha County, 342 Ark. 135, 27 S.W.3d 379
(2000); Central Southern Companies, Inc. v. Weiss, 339 Ark. 76,3 S.W.3d 294 (1999). The Schools for the Blind and Deaf would appear to fall within the common meaning of the term "school ." See Random House Webster's Unabridged Dictionary, (2nd Ed. 2001) at 1715, defining "school" as "an institution where instruction is given, esp. to persons under college age."
It might also be argued whether the definition contained in Act 999 generally contemplates the vanpool program you describe, or whether it envisions a vehicle used solely for the transportation of school students at a given time and not a mixed-use vehicle also simultaneously used for transportation of adults to and from work. We do not have the benefit of any Arkansas case law on this point. The language of the applicable definition is not restricted to vehicles used "solely" for student transportation, but a court in at least one other state has construed a similar definition as being applicable only to buses used primarily or exclusively for the transport of school children and not to the transporting of school children only incidentally to the other public transit or common carrier activities of the bus line. See, e.g., Jam v.Independent School District # 709, 413 N.W.2d 165 (Minn. 1987) (Transit Authority bus was a "school bus" under definition similar to Act 999 where bus, although open to the general public, was used exclusively at the time of accident for transport of students, routes were published under the heading "School Bus Service," and the bus stopped at places not designated as public bus stops to drop off children). Compare, Hensleyv. Toledo Area Regional Transit Authority, 121 Ohio App.3d 603,700 N.E.2d 641 (1997) (Transit Authority bus was not a school bus where separate statutes governed safety features of mass transit vehicles and facts showed that nonstudents rode buses with the students so as to negate any "exclusive use" for purposes of more explicit Ohio statutory definition). We do not have a controlling case in Arkansas on this point. The answer under Act 999 may depend upon all the facts surrounding the vanpool's transport of the students. In my opinion, however, case law from other states indicates that the *Page 6 
Act 999 definition may be construed more narrowly than its literal language provides. The Arkansas Supreme Court has stated that it is appropriate to look to the decisions of sister states when presented with novel questions. Williams v. State, 338 Ark 97, 991 S.W.2d 565
(1999); Rockefeller v. Rockefeller, 335 Ark. 145, 980 S.W.2d 255 (1998); and Stephens v. State, 320 Ark. 426, 898 S.W.2d 435 (1995).
I must note, additionally that Act 999 of 2007 is not the only relevant law regarding the definition of "school bus," or governing the transportation of primary and secondary students in Arkansas. Other generally applicable state statutes also govern the transportation of students, but also do not clearly resolve the question you have posed.
For example, a statute first adopted in 1931 provides that school boards may "purchase vehicles and otherwise provide means for transporting pupils to and from school . . ." and "[t]o this end . . . may hire or purchase such school buses or other vehicles and hire person to operate them, or make such other arrangements as it may deem best, affording safe and convenient transportation to the pupils. . . ." A.C.A. §6-19-102(a) and (b) (Repl. 1999). The language of this statute is not so restrictive as to authorize transportation only on regulation school buses.
Statutes adopted in later years appear more restrictive, but do not themselves define the "school buses" to which they apply, or are otherwise ambiguous as to the exact requirements in this regard. Section6-19-111 (Repl. 1999), adopted in 1937, requires compliance with State Board of Education regulations governing design and operation of "school buses" used for the transportation of school children whether the "school buses" are owned by the school district or privately owned and operated under contract with the district.[1] This statute states that "[s]uch regulations shall by reference by made a part of any contract with a school district." Id. at (b). This statute also states that "[a]ny person operating a school bus under contract with a school district who fails to comply with any such regulations shall be guilty of breach of contract, and the contract shall be cancelled after notice by the responsible officers of the school district." Id. at (e). This statute, however, does not itself define the "school buses" to which it applies. Additionally, the new *Page 8 
definitions added by Act 999 of 2007 do not necessarily apply to the provisions of this statute.[2]
Another relevant state statute is A.C.A. § 27-51-1002(a)(1) (Supp. 2007), which was originally adopted in 1953. It requires "[a]ll vehicles used for the transportation of pupils to or from any school" to be marked with the words "school bus" in the front and rear in letters not less than eight inches in height. Some question exists as to the scope of subsection (a)(1) of this statute, however. Read literally, this language would require even parents transporting their children to school in their own private vehicles to comply with the subsection's requirements. Section 27-51-1002 is therefore somewhat ambiguous as to precisely which vehicles it applies.[3] Cases from other jurisdictions interpreting statutory requirements similar to A.C.A. § 27-51-1002, however, again make a distinction between vehicles used primarily or exclusively for the transport of students and those vehicles used for transporting students only incidentally to their actions as common carriers. Compare, Dishinger v. Suburban Coach Company, 84 Ga.App. 498,66 S.E.2d 242 (1951) (it was negligence "per s e" for a coach company that was only transporting school children at the time of accident not to comply with statute similar to A.C.A. § 27-51-1002 requiring school bus markings), and Metropolitan Atlanta Rapid Transit Authority v.Tuck, 163 Ga. App. 132, 292S.E.2d 878 (1982) (Transit Authority bus was a "school bus" under statute similar to A.C.A. § 27-51-1002 where facts showed it was used at the time of accident exclusively to transport students, route was established for transport of students and bus stopped to let students off at places indicated by school-designated "Safety Patrol"), with Hanks v. Georgia Power Company, 86 Ga. App. 654,72 S.E.2d 198 (1952) (motor bus company transporting school children only incidentally to its functions as a common carrier, keeping regular bus stops, and not used exclusively or primarily *Page 9 
for transport of students, was not a "school bus" for purposes of statute similar to A.C.A. § 27-51-1002, distinguishing Dishinger).
Finally, A.C.A. § 6-19-122 prohibits any "public school" in the state from purchasing "nonconforming vans" to transport students to or from school or to any school-related activity. This statute does not itself address the use of such vans. It prohibits only the purchasing of such vans to transport school children.[4]
The applicable Arkansas statutes are therefore not entirely clear on the point and we do not have the benefit of Arkansas case law interpreting the meaning of the applicable statutes. Depending upon the applicable facts, cases from other jurisdictions may cast doubt on the inclusion of the vanpool program you describe in the definition of a "school bus." In my opinion, additionally, the state law definition of a "school bus" and the interpretation of the other relevant state statutes are not the only relevant considerations. Reference must also be had to any state or federal laws relating specifically to the transporting of students with disabilities. Unfortunately, these state and federal laws, like the ones mentioned above, do not clearly answer the question you pose.
I assume in this regard that the local school districts are paying the "rider fees" for the vanpool program because of applicable federal law. The Blind and Deaf School students about whom you inquire are presumably entitled to the protections afforded by the "Individual with Disabilities in Education Act" ("I D E A"). See 20 U.S.C. §§ 1400 — 1420. As described in District of Columbia v. Ramirez, 377 F. Supp. 2d 63
(D.D.C. 2005):
 . . . a state education agency . . . is required to provide special education students . . . with "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . to all children with disabilities residing in the State." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.1(a). . . . The Act and its attendant regulations also explicitly *Page 10 guarantee provision of "related services," defined as "transportation . . . and other supportive services as are required to assist a child with a disability to benefit from special education," including "travel to and from school. . . ." 34 C.F.R. § 300.24(a), (b)(15)(i). . . . [S]ee 20 U.S.C. §§ 1400(d)(1)(A), 1401(22).
 Pursuant to the provision of a free and appropriate public education ("FAPE") and related services, Federal . . . Regulations require that an individualized education program ("IEP"), including a "statement of the special education and related services . . . that will be provided for the child . . . to be educated . . .," be developed for each student. 34 C.F.R. §§ 300.341(a)(1), 300.347(a)(3) (2005). . . . The Supreme Court has further defined the role of IEPs, requiring that they be "reasonably calculated to enable the child to receive education benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982).
Id. at 65-66. (Emphasis added).
In Arkansas, the relevant state law provides that: "It is the policy of this state to provide and to require school districts to provide . . . a free appropriate public education for students with disabilities. A.C.A. § 6-41-202(a)(1). With regard to the duties of school districts, A.C.A. § 6-41-202(a)(2) states that "The State Board of Education is expressly authorized to assign responsibility for providing free appropriate public education of any child with a disability to an appropriate school district." See also, A.C.A. § 6-41-202(b) and State Board of Education "Regulations Governing Special Education and Related Services," § 1.02.2 (requiring public agencies to comply with the regulations, including the state educational agency, local educational agencies, the state schools for children with deafness and blindness and certain other agencies).
Each child's "individual education program" must set out a statement of the services, including "related services" such as transportation, that will be provided to the child. 20 U.S.C. § 1414(d)(1)(i)(IV);34 CFR 300.320(a)(4); and A.C.A. § 6-41-217(b)(3)(D) (Supp. 2007). The relevant state statutes regarding special education do not contain any provisions expressly addressing the nature of this transportation. The applicable state regulations are similarly silent, except for the provisions of "Appendix C" to the State Board of Education Rules and Regulations *Page 11 
"Questions and Answers: Interpretation of the IEP from Appendix A of 34 Code of Federal Regulations Part 300." This document, borrowed from federal law, states the following with regard to transportation of special education students:
 31. Must the public agency ensure that all services specified in a child's IEP are provided?
 Yes. The public agency must ensure that all services set forth in the child's IEP are provided, consistent with the child's needs as identified in the IEP. The agency may provide each of those services directly, through its own staff resources; indirectly, by contracting with another public or private agency; or through other arrangements.
 33. Must a public agency include transportation in a child's IEP as a related service?
 . . . In making this determination, the IEP team must consider how the child's disability affects the child's need for transportation, including determining whether the child's disability prevents the child from using the same transportation provided to nondisabled children, or from getting to school in the same manner as disabled children.
 The public agency must ensure that any transportation service included in a child's IEP as a related service is provided at public expense and at no cost to the parents, and that the child's IEP describes the transportation arrangement.
(Emphasis added).
This Appendix does not restrict the transportation to traditional "school buses."
Similarly, under the federal "IDEA," there is no express requirement that students with disabilities be transported only by regulation "school buses." Cf., e.g., Fick v. Sioux Falls School District 49-5, 337 F.3d 968
(8th Cir. 2003) (upholding, under the IDEA, a nurse-accompanied taxi ride to and from school for a student with epileptic seizures). *Page 12 
The question you have posed is thus not controlled by Act 999 alone, or even solely by state law. Other provisions of law, including the federal IDEA must be considered. Both state and federal law are silent, however, as to any specific requirements for transporting disabled students under an IEP in mixed-use conveyances with seating capacities over ten passengers. Neither state nor federal laws or regulations governing students with disabilities address this precise point.
As a consequence, neither the generally applicable state laws relating to the transportation of school children, nor the special state and federal laws relating to the transportation of students with disabilities clearly answer your question. Case law from other jurisdictions may shed some light on the issue and indicates that vehicles such as the vanpool you describe may, depending on the facts, be outside the definition. Legislative or administrative clarification may be warranted however. Local school districts may wish to keep safety foremost in view when transporting school children with disabilities and may wish to consult with their local counsels as to the best course of action.
Additionally, I must note that to the extent you seek legal advice on behalf of the State Employees' Benefit Corporation, I am prohibited from the private practice of law. Nothing in this opinion is offered, nor should it be relied upon, as providing any legal advice to private parties. Such parties must consult their own legal counsel for any needed legal advice.
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] The applicable regulations do not define the term "school bus," but pertain to "`school buses' that, with standard seating arrangement prior to modification would accommodate more than ten persons." See Arkansas Department of Education, Rules for the Specifications Governing School Bus Design, § 3.01.
[2] There is, according to my research, no one general definition of "school bus" that is applicable in all contexts. The relevant sections amended by Act 999 each state that "`As used in this section' . . . [s]chool bus means . . . a motor vehicle designed to carry more than ten (10) passengers . . . [etc.]" (Emphasis added). See Acts 2007, No. 999, §§ 1, 2, and 3.
[3] See also A.C.A. § 27-23-103(27) (defining "school bus" in the "Uniform Commercial Drivers' License Act" as meaning "a commercial motor vehicle used to transport preprimary, primary, or secondary school students from home to school, from school to home, or to and from school-sponsored events" and stating that "school bus" does not include a bus used as a common carrier." "Commercial motor vehicles" exceed certain weight limitations or are designed to transport sixteen or more passengers. A.C.A. § 27-23-103(7) (Supp. 2007). The vans you describe are not designed to carry sixteen or more passengers. I do not have information as to whether the vans in question are "commercial motor vehicles" by weight. According to my understanding, the vanpool program about which you inquire is not a "common carrier."
[4] In addition, federal law prohibits a motor vehicle dealer from selling a new vehicle which seats a driver and more than ten passengers to a school district if the vehicle is likely to be used significantly to transport students to or from school or an event related to school, unless the vehicle meets the federal specifications for "school buses."49 U.S.C. § 30125 and 30112. See also 49 C.F.R. § 571 et seq., and Op. Att'y Gen. 95-290. Motor vehicle dealers are subject to civil penalties for violation of the federal law. See 49 U.S.C. § 30165. As stated in Op. Att'y Gen. 95-290, however, "Federal law . . . does not provide any sanction for the "use" of such vans, once purchased by the school district, on the highways of the various states. [footnote omitted]. This issue . . . may be addressed by state law." Id. at 2. *Page 1